b.  Subsequent to the date that the Plan is declared effective, previously controlled tenants will be served with a written notice stating that the Plan has been declared effective. The notice will also set forh the names of previously controlled tenants, if any, who have purchased the shares allocated to their own apartments and the percentage of all previously controlled tenants which such purchasers represent, and the names and addresses of all purchasers, if any, of shares allocated to vacant apartments.

c.  As of the date of Closing, non-purchasing previously controlled tenants will be subject to the provisions of Rent Control.  The initial rents for these tenants are set forth in Section I of Part II of this Plan.

d.  Non-purchasing previously controlled tenants will have the right to remain in possession of their apartments after the closing date unless or until he or she fails to pay rent or otherwise defaults on the terms of the tenancy, except:

1.  if at least 35%* of all previously controlled tenants in the building purchase the shares allocated to their apartments within six months from the date of presentation of the Plan, a non-purchasing previously controlled tenant may be the subject of an eviction proceeding; or

2.  if the shares allocated to 80% or more of all previously controlled apartments in the building have been purchased and the 35% requirements of paragraph ·d(1) above has also been met, a non-purchasing previously controlled tenant may be subject to an immediate eviction proceeding brought by the purchaser of the shares allocated to his or her apartment.

An eviction proceeding may be commenced by any buyer of the shares allocated to the apartment of the Previously Controlled Tenant by applying for a certificate of eviction at the district rent control office of the State Division of Housing and Community Renewal ("DHCR").  Such application must be made at least two (2) years after the date this plan is declared effective or the expiration of the lease of the Previously Controlled Tenant,

---

*The base for computing the required thirty-five percent (35%) will include:

a.  (i) vacant apartments which are vacant on the date of the presentation of this Plan or (ii) rent controlled apartments which later become vacant; and

b.  one half of the Previously Controlled Tenants who are eligible senior citizens or disabled persons.

whichever is later.   The tenant who receives such a certificate
may: (i) vacate the premises voluntarily within the mandatory stay
period of three (3) months or (ii) file a protest with DHCR, or
(iii) remain and become the subject of a holdover proceeding in
Civil Court by said buyer.    If said holdover proceeding is
successful, the Civil Court will issue a warrant of eviction.  The
Civil Court has discretionary power to stay the warrant of
eviction for a period of not more than six (6) months.   However,
the tenant and his or her possessions may be subject to removal
within seventy-two (72) hours after service of the warrant of
eviction by the city marshal.

No representation or warranty is made as to the length of
time which may elapse before a certificate of eviction is issued,
or that a certificate will be issued, or as to the length of time
which may elapse before a final Civil Court order, based upon the
issuance of such certificate, is granted and made effective, or
that such court order will be granted, or that possession of such
rent controlled apartment will be obtained.

## 3.  THE RIGHTS OF NON-RENT CONTROLLED TENANTS

a.   All present tenants who were not previously subject
to Rent Control ("present tenants") will have the exclusive right
to purchase the shares allocated to their apartments for a period
of ninety (90) days from the date of presentation of this Plan.
During the ninety day period, these shares will not be offered to
any other persons.

b.   If a present tenant does not purchase the shares
allocated to his or her apartment within the ninety (90) day
period, the Corporation may offer those shares to other persons at
such prices as the Corporation establishes.

B-3a

If a valid Agreement to Purchase is executed by a non-tenant within six (6) months after the ninety (90) day period has expired, the non-purchasing present tenant will have fifteen (15) days after receiving written notice containing a copy of the executed Agreement to purchase the shares for his or her apartment on the same terms offered to the non-tenant.

c.   As of the date of closing, all non-purchasing present tenants will be afforded the rights and obligations of Rent Stabilization.

d.   Non-purchasing present tenants will be offered their choice of a one or two year lease without a cancellation clause at Closing or as soon after as practical.

The initial rents and rent differentials for the different terms of leases for each apartment are set forth in Section I of Part II of this Plan.  All non-purchasing present tenants will be required to sign a lease; any non-purchasing present tenant, except a senior citizen or eligible handicapped person, who fails to sign an offered lease may be subject to immediate eviction by either the co-op Corporation or the purchaser of the shares allocated to his or her apartment.

e.   Non-purchasing present tenants will be entitled to remain in possession of their apartments except for non-payment of rent or other default, until the latest of the following dates:

(1)   One year from the date of presentation of the Plan; or

(2)   The date on which the Plan is declared effective, if the current lease was executed prior to the date on which the Plan was declared effective; or

(3)   The expiration date of his or her lease.

Thereafter, he or she, except a senior citizen or eligible handicapped person, may be evicted by the co-op Corporation or the purchaser of the shares allocated to his or her apartment.

f.   Only subtenants occupying apartments with the permission of the present owner will be offered the right to purchase the shares allocated to those apartments.

## 4.   THE RIGHTS OF SENIOR CITIZENS AND ELIGIBLE HANDICAPPED PERSONS

Article XI corporations are not governed by the provisions of State law that protect certain senior citizens and eligible handicapped persons from eviction and "unconscionable rent increases" in co-op conversions. This Plan, however, assures certain rights to senior citizens, and to eligible handicapped persons.

All persons who are 62 years old or older on the date the Plan is presented ("senior citizens"), and all eligible disabled persons who do not purchase the shares allocated to their apartments, regardless of their status under Rent Control or Rent Stabilization, will not be subject to eviction proceedings (except for non-payment of rent or other default) and shall be entitled to remain in possession of their apartments.

Non-purchasing senior citizens and eligible disabled persons who were not previously rent controlled will be offered their choice of a one or two year lease and should sign a lease in order to implement their rights under Rent Stabilization. These tenants will be entitled to renewal leases from the co-op Corporation so long as they continue to occupy their apartments and are not in default of the terms of their tenancies.

"Eligible senior citizens" (see below) will also be entitled to apply for an exemption from rent increases which were implemented by the City of New York during your tenancy prior to the Date of Closing and rent increases which are implemented by the co-op Corporation after the Date of Closing (Senior Citizen Rent Increase Exemptions, also called "SCRIE") under Section YYY 51-1.0 et seq of the New York City Administrative Code (a copy of the provisions of which is attached to this Plan as Exhibit 10), whether or not they choose to become tenant co-operators.

Eligible senior citizens* are heads of household and their spouses who are:

    (i)   sixty-two (62) years old or older on the date of presentation of the Plan; and

    (ii)  are not receiving welfare; and

    (iii)  have an annual adjusted income (income from all members of household) of less than $10,000. (See Exhibit 10 for definition of "income" and "household members".)

The maximum rent that eligible senior citizens can be required to pay may not exceed one-third of the combined income of all household members, except that increased costs of gas or electrical utility charges, or an increase in dwelling space, services, equipment or major capital improvements may be passed on to them, above the one-third limitation.

If there are any eligible senior citizens in the building to whom rent increase exemptions are granted under Section YYY 51-1.0 of the City's Administrative Code, the co-op may apply to obtain the following benefits:

    (a)  reduction of real estate taxes in a dollar amount equal to the amount of rent or maintenance exemptions granted to the senior citizens, so that the co-op Corporation gets an advantage equivalent to the benefits given to individual senior citizens;

*The term "eligible senior citizens" in this Plan will refer only to eligibility for SCRIE exemptions and will not refer to any other use of "eligible senior citizens" under New York law.

(b)  the receipt of compensatory funds from HPD if the co-op. Corporation is totally exempt from real-estate taxes as a result of rent increase exemptions granted to senior citizens, if such funds are available.

## 5.  RENT DURING NON-PURCHASING TENANTS' POSSESSION

The initial rent for all non-purchasing tenants shall be the last rent charged by or on behalf of the City of New York, pursuant to Local Law 14 (Exhibit 12).  The initial rent for former rent-controlled non-purchasing tenants will be set by HPD and will not exceed the Maximum Base Rent (MBR).  The initial rent set for all other non-purchasing tenants will be set by HPD as follows:

a.  for a one year lease, SIX percent (6%) greater than the maintenance charge indicated in Section I, Part II of this Plan;

b.  for a two year lease, NINE percent (9%) greater than the maintenance charge indicated in Section I, Part II of this Plan.

See Schedule of Rent and Maintenance, Section I in Part II for the exact rents for each apartment.

The co-op Corporation will not be entitled to increase the rents set by HPD for non-purchasing tenants after closing except as specifically permitted by Rent Control and Rent Stabilization.

22

SECTION C

RIGHTS OF PURCHASERS WHO
ARE NOT PRESENT TENANTS

After Closing, and subject to the applicable rights of exist-
ing tenants not in default and the time limits set forth in Sec-
tion B of this Plan, the co-op Corporation may require the
purchaser, or the purchaser may elect, to commence summary
proceedings to evict the tenant in occupancy at the purchaser's
own expense, unless the purchaser has purchased shares allocated
to a non-purchasing senior citizen's or eligible handicapped
person's apartment. In such a case, the purchaser has no right to
evict the senior citizen or eligible handicapped person except for
non-payment of rent or other default.

No representation can be or is made as to:

a.   whether an eviction proceeding will be successful; or

b.   the length of time that may elapse before a final court
     judgment is issued; or

c.   the length of time that may elapse before possession is
     actually obtained.

A purchaser of shares allocated to an apartment occupied by a
tenant will be given a Proprietary Lease that is subject to the
terms of any existing lease or tenancy. Copies of all leases in
effect at the date of closing, if any, will be available at HPD or
at the building for examination by prospective purchasers.

A person interested in purchasing the shares allocated to an
apartment in which he does not reside is advised to examine any
lease for such apartment to ascertain the rent, expiration date
and obligations imposed on the landlord. A list of all senior
citizens will also be available for inspection.*

A non-occupant purchaser will be required to pay the main-
tenance charges for his or her apartment, whether such carrying
charges are more or less than the rent received from the tenant in
occupancy. If the carrying charges are less than the rent receiv-
ed from the tenant in occupancy, the non-occupant purchaser must
pay the difference to the co-op Corporation.

A non-occupant purchaser will have all the obligations and
responsibilities of all other tenant co-operators, and all the
obligations and responsibilities as a landlord under Rent Control

---

*Information as to which tenants are senior citizens will be
obtained from the tenants themselves and should be verified by
non-occupant purchasers.

or Rent Stabilization, including paying the full maintenance charges and any special assessments, performing all necessary maintenance, repairs and replacements in the apartment, and ensuring that full services are provided to the tenant in occupancy.

It is recommended that a non-occupant purchaser consult with an attorney in order to become fully apprised of the effect of the Rent Control or Rent Stabilization Laws and Regulations and other applicable statutes, as well as any lease for the apartment, on his or her rights as a purchaser and his or her obligations to any tenant in occupancy.

A purchaser of the shares allocated to an apartment subject to a lease will be entitled to receive the unapplied portion of any security deposit held by the co-op Corporation, if any, under the terms of the lease. Such security must be held by the purchaser, in trust, in an interest bearing account in accordance with Section 7-103 of the New York General Obligations Law. Upon receipt of such security deposit, the purchaser will be required to acknowledge, in writing, receipt thereof and agree to indemnify the Sponsor and/or the co-op Corporation against all claims or liability in connection therewith.

THE CO-OP CORPORATION AND THE PURCHASERS OF SHARES ALLOCATED TO OCCUPIED APARTMENTS MUST PROVIDE NON-PURCHASING TENANTS WITH ALL SERVICES AND FACILITIES REQUIRED BY LAW ON A NON-DISCRIMINATORY BASIS. NON-OCCUPANT PURCHASERS SHALL NOT ENGAGE IN ANY COURSE OF CONDUCT WHICH SUBSTANTIALLY INTERFERES WITH OR DISTURBS THE COMFORT, REPOSE, PEACE OR QUIET ENJOYMENT OF NON-PURCHASING TENANTS IN THEIR USE OR OCCUPANCY OF THEIR APARTMENTS. A NON-PURCHASING TENANT MAY SEEK RELIEF FROM HOUSING COURT IF A NON-OCCUPANT PURCHASER PURSUES SUCH A COURSE OF CONDUCT.

## SECTION D

### EFFECTIVE DATE OF PLAN AND CLOSING DATE

The following provisions will determine whether, and when, this Plan will become effective:

1.  The Plan will be declared effective if, within ninety (90) days from the date of its presentation, sixty percent (60%) or more of the present tenants, as defined in Section B, have signed Agreements to Purchase and have submitted them to HPD.  If fewer than sixty percent (60%) of the present tenants have signed Agreements to Purchase within ninety (90) days, HPD reserves the option to extend such time by up to a maximum of six (6) additional months, or to abandon the Plan.  If the Plan is not declared effective or extended within these time limits, it will be deemed abandoned and void.

2.  When the conditions set forth in Paragraph 1 for declaring the Plan effective have been met, HPD will serve written notice on all present tenants in the building that the Plan has been declared effective and will file an amendment to the Plan with the Attorney General stating the date on which the Plan was declared effective.

3.  After the Plan has been declared effective, title will close on a date (hereafter called the "Closing Date") to be fixed by HPD, which will be not more than ninety (90) days thereafter unless HPD adjourns the Closing Date, and not sooner than thirty (30) days thereafter unless all the purchasing tenants request that title close sooner than thirty (30) days.

4.  a.  After the Plan has been declared effective, it will not be abandoned unless:

   (i)  there is a defect in title to the property which cannot be reasonably cured, or

   (ii) the present tenants who are not in rent arrears who have signed Agreements to Purchase have not paid, by fifteen (15) days prior to the scheduled Closing Date, the following:

   a.  the purchase price for the shares allocated to their apartments; and
   b.  any additional monies to the co-op Corporation for the purpose of paying the full purchase price of the building.  (See p. A-6, Purchase Price)

   b.  If there is a defect in title, HPD does not have an obligation to incur expense or to engage in litigation to cure it.

D-1

25

c.    If the payments specified in paragraph 4(a)(ii), above, have not been made by the tenants described therein by fifteen (15) days before the scheduled Closing Date, HPD reserves the right to:

(i)    waive the fifteen (15) day period; or

(ii)    abandon the Plan; or

(iii)    adjourn the Closing Date, within the time limits set forth in this Section, until the payments specified in paragraph 4(a)(ii), above, have been made.

d.    If the Plan is abandoned, tenants who have made the payments specified in paragraph 4(a)(ii), above, will receive their money back in full with interest, if any, within thirty (30) days of the date on which the Plan is abandoned.

5.    A tenant who has signed an Agreement to Purchase may cancel and rescind such agreement at any time up to the date the Plan is declared effective.

6.    On the Closing Date, title to the property will be transferred to the co-op Corporation and each purchaser will become obligated to pay the maintenance charges under the Proprietary Lease as of the Date of Closing.

7.    Shares allocated to apartments not purchased by the Date of Closing will be purchased by the co-op Corporation or its designee on the Date of Closing and held by it until sold to purchasers.

8.    Stock Certificates of the co-op Corporation and Proprietary Leases will be issued and given to purchasers within three (3) business days of the Date of Closing.

D-2

26

TIME CHART



Day 1 — Date of Presentation of the Plan

30

90-Day exclusive right to purchase period*

60

90 — Last day for the Plan to be declared effective (unless offering period of Plan is extended by HPD).

120

150

Closing Date (assuming Plan is declared effective on the 90th day). Closing occurs 30 to 90 days after the Plan is declared effective

180

HPD may extend the offering period of the Plan up to 6 additional months or abandon the Plan

210

240

270

*Closing may occur at any time within the 90-day exclusive right to purchase period if 60% of present tenants sign Agreements to Purchase and post their purchase prices (and related payments, if any) and 100% of these purchasers request that Closing be held sooner than 30 days after the Plan has been declared effective. All non-purchasing tenants will still have the exclusive right to purchase the shares allocated to their apartments until the original 90 day period has expired.

27

THIS OFFERING PLAN IS A COMPLEX, TECHNICAL DOCUMENT.  YOU ARE
STRONGLY ADVISED TO CONSULT AN ATTORNEY OF YOUR CHOOSING BEFORE
SIGNING AN AGREEMENT TO PURCHASE SHARES IN THIS CO-OP CORPORATION.


        La compra de su apartamiento cooperativo tiene signi-
ficante consecuencia financiero y legales.  El Ministro De Justi-
cia firmemente solicita que usted lea esta planilla de ofrenda
con mucho cuidado y consulte un abogado antes de asignando su
firma en un acuerdo  de suscripcion.


THIS PLAN IS AN EVICTION PLAN.  NON-PURCHASING TENANTS OTHER THAN
SENIOR CITIZENS AND ELIGIBLE DISABLED PERSONS WILL BE EVICTED IN
CERTAIN CIRCUMSTANCES.  (SEE PART I, SECTION B, OF THIS PLAN FOR
FULL EXPLANATION)


PURSUANT TO SECTION 352 (e) (9) OF THE GENERAL BUSINESS LAW OF THE
STATE OF NEW YORK, ALL DOCUMENTS REFERRED TO IN THIS PLAN SHALL BE
AVAILABLE FOR INSPECTION AT THE DIVISION OF ALTERNATIVE MANAGEMENT
PROGRAMS, DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, 75
MAIDEN LANE, 5th FLOOR, NEW YORK, NEW YORK  10038.

TABLE OF CONTENTS

PART I

| Section | Material | Page |
|---------|----------|------|
| A. | Introduction ..................... | A-1 |
| 1. | Terms for Sale of the Building ..................... | A-2 |
| 2. | What is a Co-op Corporation? ................... | A-2 |
| 3. | The Meaning of Being a "Tenant Co-operator" ......... | A-4 |
| | a.  Shares and Stock Certificate .............. | A-4 |
| | b.  Proprietary Lease ......... | A-4 |
| | c.  Purchase Price ........... | A-6 |
| | d.  Unsold Shares ............. | A-7 |
| | e.  Maintenance Charges and Rent ................. | A-7 |
| 4. | Sale or Transfer of Shares .... | A-8 |
| 5. | Reserve Fund or Working Capital Fund ................. | A-9 |
| 6. | Closing Procedures and Costs... | A-9 |
| 7. | Deed and Title ............... | A-10 |
| 8. | Tax Obligations of the Co-op Corporation | A-11 |
| B. | The Rights of Present Tenants | |
| 1. | General ..................... | B-1 |
| 2. | The Rights of Previously Rent Controlled Tenants ....... | B-2 |
| 3. | The Rights of Non-Rent Controlled Tenants ........... | B-3 |
| 4. | The Rights of Senior Citizens.. and Eligible Handicapped Persons | B-4 |
| 5. | Rent During Non-Purhasing Tenants' Possession .......... | B-6 |

2

i

## SECTION E

### STATEMENT OF TRAINING AND MANAGEMENT EXPERIENCE
### Tenant Interim Lease Program

#### BACKGROUND

This building has participated in HPD's Tenant Interim Lease Program (TIL).  The TIL lease will be cancelled as of the date of closing to the co-op Corporation. The specifics of that participation are described in Section H of this Plan.  This section is a general description of the TIL program.

When tenants living in a building acquired by the City through in rem tax foreclosure proceedings (in rem) choose to assume management of their building, they may apply to HPD for acceptance into TIL, a program that offers building management and training experience, imposes certain legal responsibilities on the tenants and has as its ultimate goal, sale of the building to an Article XI co-op.

In order to apply to TIL, the tenants must form a Tenants Association, which is generally an unincorporated association. For acceptance into TIL, the Association must meet the following HPD program application requirements:

1.  Submit a resolution signed by at least 60% of the tenants in the building indicating their desire to have the Tenants Association assume management of the building;

2.  Submit a completed TIL application form which requires information about the rent roll, the conditions of the building (including a description of any emergency conditions requiring repair), and the Tenants Association, including a copy of its Articles of Association or Certificate of Incorporation, either of which must set forth the purpose and responsibilities of the Association and the officers.  HPD provides sample forms for Articles of Association and Certificates of Incorporation;

3.  Obtain and submit a liability insurance policy insuring the Tenants Association and the City of New York in the amount of $300,000;

4.  Submit proof of the existence of a Tenants Association (or corporate) bank account, with evidence that the bank has accepted a provision that the account is to be maintained by the Tenants Association as managing agent on behalf of the City, as owner of the building.

Upon completion, the Tenants Association signs an eleven month Interim Lease with HPD to manage the building.

## RESPONSIBILITIES OF THE TENANTS ASSOCIATION AS LESSEE

Once the Tenants Association and HPD have executed the 11 month Interim Lease, the Tenants Association assumes the formal responsibilities specified in the Lease. These responsibilities include:

1. Collection of all rents due from residential and commercial units.

2. Employment and supervision of building employees, if any.

3. Advertise and offer for rent vacant apartments.

4. Maintain a separate interest-bearing bank account for all security deposits received.

5. Engage counsel, institute and maintain appropriate legal actions or proceedings for the collection of rent from tenants or the eviction of tenants or other persons from the building for non-payment of rent, illegal occupancy or other reasons recognized by law. The Tenants Association must obtain written approval of HPD prior to commencing a summary proceeding to evict a tenant or other person on any ground other than non-payment of rent.

6. Make a good faith effort to collect back rent due the City but not paid when the building was under the management of either the Department of General Services or HPD.

7. Maintain and operate the building in a proper, safe and sanitary manner.

8. Contract for electricity, gas, fuel, extermination and other services and utilities.

9. Maintain payroll records for each of the Tenants Association's employees, if any, and sign receipts for all salaries, wages and other compensation paid.

10. Prepare the necessary forms for and pay unemployment insurance premiums; pay social security taxes and withholding taxes and prepare all other forms and pay such other taxes and other monies as may be required by any federal, state or municipal authority for each of the Tenants Association's employees, if any.

11. Promptly pay for all supplies, materials and equipment purchased and work or labor ordered in connection with its obligations under the lease.

12. Systematically and promptly respond and attend to complaints and requests by tenants with respect to services and facilities.

13. Maintain records and furnish monthly accounting statements of revenue and expenses to HPD.

14. Restructure rents with the cooperation of HPD when rent collected is not sufficient to pay maintenance and operating expenses of the building.

Upon the expiration of the term of the Interim Lease, it may be extended or renewed, if both parties agree.

## TRAINING AND TECHNICAL ASSISTANCE

When a Tenant Association and HPD enter into an 11 month Interim Lease, a variety of mandatory and optional training and technical assistance services are available to the Tenants Association.

## REQUIRED

Shortly after the execution of its lease with HPD, the Tenant Association is notified by HPD, in writing, that the President ands Treasurer or Secretary of the Tenants Association are required to attend a training course to help them learn about the management of their building. The course, which lasts for three evening sessions (a total of approximately nine hours of classroom training) covers building maintenance, setting up annual and monthly budgets, bookkeeping, accounting, record-keeping procedures, and suggestions for how to reduce building expenses.

The course is provided under HPD sponsorship by the Urban Homesteading Assistance Board (UHAB), a non-profit citywide technical assistance organization with extensive experience in providing housing assistance to tenants and community groups. UHAB provides training and technical assistance services through a contract with HPD.

At the required evening course, UHAB distributes two manuals;

1. Bookkeeping Manual - This manual, approved by DAMP, introduces the required format for all Tenants Association accounting and record-keeping. The manual provides standard accounting and reporting forms to the Tenants Association and explains their use.

2. Homesteaders Manual - This manual, approved by HPD, explores a wide variety of building management, maintenance, repair and housing issues generally.

Upon the completion of the evening course, representatives of UHAB are required, through their contract with HPD, to visit each building site on at least two separate occasions. These technical assistance visits are designed to insure that each Tenants Association has set up its accounting records in the required format, and to resolve any issue of record-keeping, reporting, or general organization that the Tenants Association may have.

In addition, HPD may request that representatives of UHAB conduct additional site visits if problems develop within the building or Tenants Association. Such special site visits may be requested by HPD to resolve problems of late reporting, inadequate record-keeping, low rent levels or inadequate revenue to meet expenses, internal organizational difficulties, etc.

UHAB also conducts several additional required training courses. Tenants Associations are informed that attendance at these courses is required.

1.  Payroll Training Course - This course educates Tenants Associations who are issuing payrolls about the proper techniques for issuing payrolls to building employees, how to calculate and deduct required City, State, and Federal taxes.

2.  Maintenance Training Course - This course explores techniques of tenant-controlled maintenance activity, how to order supplies and repairs, how to identify suitable contractors or service agents, methods of reducing building maintenance expenses, etc.

3.  Disposition Training Course - This course, which began in March, 1980, explores issues and responsibilities of ownership for those Tenants Associations who are preparing to purchase their buildings from the City. HPD is advising Tenants Associations of its availability.

In addition to the above list of required courses, UHAB conducts special courses from time to time at the request of HPD. One such course being offered for the first time in March, 1980, is a remedial bookkeeping and accounting course for Tenants Associations which HPD believes are experiencing recurring accounting or reporting difficulties. HPD notifies such Tenants Associations, in writing, that attendance at such a course is required.

After the co-op buys the building, it has the option of hiring a professional managing agent or a non-profit community management group, both of which will charge managing fees, or continuing to manage the building itself.

E-4

SECTION F

INCOME TAX DEDUCTIONS
FOR PURCHASERS

It is the view of the Office of Property Management and the Division of Alternative Management Programs of HPD that a reasonable relationship exists between the purchase price of the shares allocated to each apartment and that portion of the fair market value of the co-op Corporation's equity in the land and the building which is attributable to the apartment to which such shares are allocated. The test of reasonable relationship should be met because of the following special circumstances that apply to buildings, such as this, that have participated in HPD's Tenant Interim Lease ("TIL") Program and are being sold to tenant cooperatives: the sales prices have been calculated by multiplying the number of apartments by a fixed rate, in this case the sum of $250; there is no established market value for the buildings because of the unique nature of the TIL Program and the restrictions on resale imposed by the Board of Estimate; and the low per unit price.  *See footnote on F-2.

It is the further view of the New York City Department of Housing Preservation and Development that if this Plan is declared effective in accordance with its terms and there is a closing pursuant to the Plan, the following will be applicable to purchasers who wish to itemize their deductions on their federal, state or city income tax returns:

In any taxable year in which not less than 80% of the Apartment Corporation's gross income consists of rent received from qualified tenant co-operators, each tenant co-operator should be entitled, under Section 216(a) of the Internal Revenue Code, Section 615 of the Tax Law of the State of New York and Section T46-15.0 of the New York City Administrative Code as presently in effect, to deduct from his or her adjusted gross income for Federal, New York State and New York City income tax purposes, his or her proportionate share of interest charges (if any) and real estate taxes paid or incurred by the co-op Corporation (before the close of the taxable year of the tenant co-operator) ("Deductions"), to the extent that such tenant co-operator has paid to the co-op Corporation, within the taxable year, an amount equal to such proportionate share of taxes paid or incurred by the co-op Corporation.

It should be noted that any purchasers who do not itemize their deductions on their tax returns because their income or other circumstances are such that completing the standard, non-itemized "short" form tax return (Form 1040A) is more beneficial to them, will not benefit from the availability of deductions for interest and real estate taxes.

In addition, the deductions are only available in any year in which 80% of the co-op Corporation's gross income consists of rent received from qualified tenant co-operators. For this reason, such deductions may not be available until the fiscal year of the co-op Corporation following the Closing Date when it is operated solely as a cooperative.  *See footnote below.

No warranties or representations are made, however, that the Internal Revenue Service, the Department of Taxation and Finance of the State of New York or the Department of Finance of the City of New York will be in accord with all or any part of the information provided in this Plan or that the tax laws may not change, or that judicial or administrative rulings inconsistent with information provided in this Plan will not be forthcoming.  It should also be noted that the tax law, as applicable to cooperatives, has also sometimes been subject to differing or changing interpretations among courts and agencies involved in determinations and that the law with respect to cooperative corporations formed under the Private Housing Finance Law and other laws is less developed than the law with respect to cooperative corporations formed solely under the Business Corporation Law.

Purchasers should not rely on the contents of this Plan in determining the deductibility of a portion of the maintenance charges.  If the deductibility of a portion of maintenance charges is a factor in deciding whether to purchase or not, it is recommended that prospective purchasers consult an attorney or accountant and discuss this Plan and the significance of the availability of such deductions.

---

*In any event, tenants may not be entitled to deductions under Section 216(a) of the Internal Revenue Code and related state and local tax provisions if:

(a) the reasonable relationship described on Page F-1 for each apartment, between the share allocation and attributable portion of the fair market value of the co-op Corporation's equity in the land and building, does not or ceases to exist, or,

(b) less than eighty (80%) percent of the shares are held by qualified tenant co-operators because the co-op Corporation failed to transfer a sufficient number of the shares unsold at the closing to natural persons within three (3) years after the closing.

IRS may determine that there is no reasonable relationship regarding the allocation of shares.  If such a determination is made, no Deductions by the tenant-cooperator will be allowable.

F-2

DISK# 21

## SECTION G

## GENERAL

This Plan does not knowingly omit any material fact or knowingly contain any untrue statement of a material fact. This Plan does not contain a full summary of all the provisions of the various documents referred to herein. Statements made as to the provisions of such documents are qualified in all respects by the contents of such documents.

There is currently no existing indebtedness of the Corporation to any party, agency or institution other than a note for the price of unsold shares, if any, which will be repaid as and when the shares are sold. The Corporation does not owe any outstanding real estate taxes or water and sewer charges. There are no known lawsuits or other proceedings now pending, or any judgments outstanding, against the Corporation which might become a lien against the property or which might materially affect this Plan.

This Plan is offered only to residents of the State of New York who are over 18 years of age for residential occupancy in the building.

In accordance with the laws of the State and City of New York, the Corporation will not discriminate against any person because of race, sex, creed, color, national origin, ancestry, age, or sexual orientation or affectional preference in the sale of shares or leasing of any apartment in the building.

As of the date of first presentation of this Plan, neither the City, nor any representative or agent thereof, has raised funds or made any preliminary offering or binding agreement with any tenants, subtenants or nonresident prospective purchasers with respect to any apartments in the building.

The City reserves the right, up to the date the Plan is declared effective, to revise the terms and conditions on which the shares of the Corporation are to be sold, without obtaining the consent of purchasers or others, including revisions affecting the rights, obligations and liabilities of the Corporation, purchasers or prospective purchasers and the City under this Plan. All substantive or material revisions will be contained in a duly filed amendment to this Plan, where required.

In the case of a material revision adversely affecting the rights, obligations or liabilities of existing purchasers, such purchasers will be given the right to rescind their Agreement to Purchase.

34

In the event any laws or regulations are repealed, revised, replaced, amended or judicially held unlawful or invalid for any reason, in part or otherwise, then the City reserves the right, but without obligation, to amend this Plan, applicable to all purchasers, in order to change the provisions herein in conformity with such repeal, revision, replacement, amendment or judicial holding, and such right shall apply whether or not the Plan has been declared effective so long as title has not closed.   If no amendment is promptly made within thirty (30) days of such event, this Plan shall be continued without such change.

All money received under the Agreements to Purchase by the co-op Corporation will be deposited in the Corporation's bank account, and will be held "in trust", to be used only for the purpose of purchasing the property from the City of New York.   See Section J for name of bank and names of signatories.   If for any reason whatsoever title to the property is not transferred to the Corporation within 120 days from the date the Plan is declared effective, then all such money shall be fully returned to each purchaser, with interest, if any.

G-2

## THE BOARD OF ESTIMATE'S RESALE RESTRICTIONS

**Passed February 21, 1980 and amended June 25, 1981**

A.  For ten years from the date of the conveyance of title to the building to the co-op Corporation by the City of New York:

   1.  The building shall provide housing for persons and families of low income as defined in Section 576 of Article XI of the Private Housing Finance Law;

   2.  The building shall not be sold or otherwise disposed of without the prior written approval of the Commissioner of HPD.


B.  Within the first two years from the date of the original conveyance by the City to the co-op Corporation, if an individual tenant co-operator sells his or her shares in the co-op Corporation, he or she may retain the following from the sales price:

   1.  The original purchase price;

   2.  The amount of special assessments for building-wide capital improvements, if any, that the co-op Corporation has levied upon the selling co-operator;

   3.  The amount spent for capital improvements to the individual unit that the selling tenant co-operator can document to the satisfaction of the co-op Corporation;

   4.  The co-op Corporation will retain the entire balance of the sales price, if any, as a reserve for capital and operating expenses, unless 75 percent of the shareholders approve an allocation of up to 30 percent of the balance to be retained by the selling tenant co-operator.

5. The co-op Corporation may further limit the portion and amount of the sales price to be retained by selling tenant co-operators as outlined in 3 and 4 by amending its by-laws by vote of 75 percent of the shareholders and by distributing such amendments in writing to all shareholders.

C. After two years from the date of the original conveyance by the City, and for the remainder of the ten year period referred to in (A), a selling tenant co-operator may retain the following from the sales price:

1. The original purchase price;

2. The amount of special assessments for the building-wide capital improvements, if any, that the co-op Corporation has levied upon the selling tenant co-operator;

3. The amount spent for capital improvements to the individual unit that the selling tenant co-operator can document to the co-op Corporation's satisfaction;

4. From the balance of the sales price, if any, the selling tenant co-operator may retain up to 50 per cent. The co-op Corporation will retain at least 50 per cent of the balance as a reserve for capital and operating expenses, and may increase its share of the balance by amending its by-laws by vote of 75 per cent of the shareholders and by distributing the amendment in writing to all shareholders;

5. The co-op Corporation may further limit the portion and amount of the sales price to be retained by selling tenant co-operators as outlined in 3 and 4 by amending its by-laws

37

by vote of 75 per cent of the shareholders and by distrib-
uting such amendments in writing to all shareholders.  Any
other amendments to the by-laws that change the distribu-
tion of the portion or the amount of the sales price be-
tween selling tenant co-operators and the co-op
Corporation which are not set forth herein will require
HPD's approval.

These resale provisions may not be altered by the co-op
Corporation except as set forth herein, or except as allowed by
HPD.

-3-

38

BY-LAWS

## ARTICLE I

### NAME AND LOCATION OF CORPORATION

The name of this Corporation is 94-102 HAMILTON PLACE

Housing Development Fund Corporation.  Its principal office is

located at 94 HAMILTON PLACE          , New York.

## ARTICLE II

### PURPOSE

The purpose of this Corporation is to provide its share-

holders with a cooperative housing project consistent with the

provisions set forth in the Certificate of Incorporation.

## ARTICLE III

### MEETINGS OF SHAREHOLDERS

Section 1.  Place of Meeting

All meetings of the shareholders of the Corporation shall be

held within the cooperative housing project or at such place

within the City of New York specified in the notice of the meeting

or in the waiver of notice thereof.

Section 2.  Annual Meetings

A meeting of shareholders shall be held annually for the

election of directors and the transaction of other business on the

first day of _____ (month) of each year if it is not a

legal holiday, and if it is a legal holiday, then on the next

succeeding day not a legal holiday.

EXHIBIT 4

Section 3    Special Meetings

Special meetings of the shareholders of the Corporation may be called at any time by the President, or by order of the Board of Directors (Board) given at a meeting thereof or by 10% of the shareholders of the Corporation. The notice or waiver of notice of any special meeting shall state the time and place of such meetings and the purpose of the meeting. No business shall be transacted at a special meeting except as stated in the notice.

Section 4    Notice of Meetings

Written notice of the annual meeting or any regular meeting will state the place, date and hour, and will be given personally or by first class mail to each shareholder entitled to vote at such meeting not less than ten nor more than fifty days before the date of the meeting. Written notice of a special meeting will state the place, date and hour, and indicate that it is being issued by or at the direction of the person or persons calling the meeting, and state the purpose or purposes for which the meeting is called. Notice of a special meeting will be given, personally or by first class mail to each shareholder entitled to vote at such meeting not less than ten nor more than fifty days before the date of the meeting.

Section 5    Waiver of Notice

Written notice of any meeting does not have to be given to any shareholder who submits a signed waiver of notice, in person or by proxy. The attendance of any shareholder at a meeting, in

2

person or by proxy, without protesting the lack of notice prior to the conclusion of the meeting shall constitute a waiver of notice by that shareholder.

Section 6    Quorum

At all meetings of the shareholders of the Corporation, the presence, in person or by proxy, of a majority of all shareholders shall be necessary to constitute a quorum for transaction of business.

Section 7    Voting

At every meeting of the shareholders, each shareholder present, either in person or by proxy, shall have the right to cast only one vote on each question regardless of the number of shares held by the shareholder. In the event the shares allocated to one apartment are held by more than one person, such persons shall jointly or severally cast the one vote. If two or more persons holding one vote cannot agree on the casting of that vote, each person shall be entitled to cast the fraction of the vote which represents his or her interest. The vote of the majority of those present, in person or proxy, shall decide any question brought before the meeting, unless the question is one for which, any express provision of law, these By-Laws or the Certificate of Incorporation requires a different vote, in which case such express provision shall govern and control. Voting by shareholders shall be by voice vote unless any shareholder present at the meeting, in person, demands a vote by written ballot.

-3-

Section 8.  Eligibility to Vote

All shareholders in good standing in the Corporation ten days before the date of any meeting are entitled to notice of the meeting and are eligible to vote at the meeting.  No shareholder shall be eligible to vote or to be elected to the Board who is shown on the books or management accounts of the Corporation to be more than two months delinquent in payments due the Corporation under the Proprietary Lease.

Section 9.  Adjourned Meetings

If there is not a quorum at any meeting, a majority of the shareholders present may adjourn the meeting to some future time and place.  No notice of the time and place of the adjourned meeting need be given other than by posting in a prominent place in the housing project.  At the adjourned meeting, the quorum required shall be the same.

Section 10.  Proxies

A shareholder may appoint as his or her proxy any other persons to act in his or her behalf.  In no case may a shareholder cast more than one vote by proxy in addition to his or her own vote.  Any proxy must be filed with the Secretary before the appointed time of each meeting.  Every proxy must be signed by the shareholder or his or her attorney-in-fact.

4

## Section 11. Order of Business

The order of business at all regularly scheduled meetings of the shareholders shall be as follows:

i)    roll call
ii)   proof of notice of meeting or waiver of notice
iii)  reading of minutes of preceding meeting
iv)   reports of officers
v)    reports of committees
vi)   election of directors
vii)  unfinished business
viii) new business


## ARTICLE IV

### DIRECTORS

### Section 1.  Number and Qualifications

The affairs of the Corporation shall be governed by a Board composed of _____ shareholders.  Any shareholder who is at least 18 years of age shall be eligible to be elected as Director.  The number of Directors may be increased or decreased by action of a majority of shareholders subject to the limitations that a decrease may not shorten the term of any incumbent director or reduce the number of Directors to less than three (3).


### Section 2.  Powers and Duties

The Board shall have all the powers and duties necessary for the Administration of the affairs of the Corporation and may do all such acts and things except those acts which, by law, these By-Laws or the Certificate of Incorporation are directed to be

5

P.56 (3.85)

exercised and done by the shareholders, or expressly prohibited. The Board may, in its discretion, authorize the conversion, subdivision or reallocation of space in the building for which there are currently issued one or more Proprietary Leases, where such space is suitable to the primary purposes of the Corporation as set forth in the Certificate of Incorporation, and may allocate or reallocate shares to such space and authorize the execution of one or more Proprietary Leases for such space.

Section 3.   Election and Term of Office

Each Director shall be elected by vote of the shareholders of the Corporation at the meeting called for the elections thereof. Directors shall serve for a term of one year.  Except as otherwise provided in these By-Laws, Directors shall be elected at the annual meeting of the Corporation.  Each director shall continue in office until the close of the meeting at which a successor is elected, or until his or her earlier death, resignation or removal.

Section 4.   Resignation

Any Director may resign at any time by delivering a written resignation to the office of the Corporation.  Such resignation shall take effect at the time specified therein or, if not so specific, upon receipt thereof.

Section 5.   Removal of Directors

At any regular or special meeting of the shareholders duly called, any Director may be removed with or without cause by the affirmative vote of the majority of the shareholders of record, and a successor may then be elected to fill the vacancy thus created.   Any Director whose removal has been proposed by the shareholders shall be given an opportunity to be heard at the meeting.   The term of any Director who becomes more than two months delinquent in payment of his maintenance charges shall be automatically terminated, and a replacement shall be duly elected.

Section 6.   Vacancies

Vacancies occurring in the office of any Director, for any reason, including the removal with or without cause, shall be filled by vote of the shareholders of the Corporation.   A Director elected to fill a vacancy shall hold office until the next annual meeting at which the election of directors is the regular order of business and until his successor is elected and qualified.

Section 7.   Regular Meetings

Regular meetings of the Board may be held at such time and consistent with the Certificate of Incorporation, as determined by a majority of the Directors, but at least four such meetings shall be held during each year.   Notice of regular meetings of the Board shall be given to each Director, personally or by mail, telephone or telegraph, or in such other manner as may be provided by resolution of the Board, at least three (3) days prior to the day named for such meeting.

Section 8.   Special Meetings

Special meetings of the Board may be called by the President
on one day notice to each Director, given personally or by mail,
telephone or telegraph, which notice shall state the time, place
and purpose of the meeting.   Special meetings of the Board shall
be called by the President or Secretary in the same way and with
the same notice on the written request of at least ten per cent
(10%) of all Directors.

Section 9.   Waiver of Notice

Before or after any meeting of the Board of Directors, any
Director may, in writing, waive notice of such meeting and such
waiver shall be deemed equivalent to the giving of such notice.
Attendance by a Director at any meeting of the Board shall be a
waiver of notice by him or her of the time and place thereof.   If
all the Directors are present at any meeting of the Board, no
notice shall be required and any business may be transacted at
such meeting.

Section 10.  Quorum

At all meetings of the Board a majority of the Directors
shall constitute a quorum for the transaction of business, and the
acts of the majority of the Directors present at a meeting at
which a quorum is present shall be the acts of the Board.   If, at
any meeting of the Board, there is less than a quorum present, the
majority of those present may adjourn the meeting to some future
time and place.   At any such adjourned meeting, any business which

8

might have been transacted at the meeting as originally called may be transacted without any further notice.

### Section 11.   Annual Maintenance and Operating Expenses

A.  The Board shall from time to time, except as may be otherwise restricted by the Proprietary Lease, determine the Maintenance and Operating expenses of the Corporation, and fix the term and manner of payment of maintenance charges (rent).

B.  The Board shall have discretionary power to prescribe the manner of maintaining and operating the apartment house of the Corporation within the limits of annual operating budget and maintenance charges, subject to the approval of the shareholders. Any expenditures made by the Corporation's officers or its agents under the direction or with the approval of the Board shall be deemed necessarily and properly made for such purpose.

C.  The Board may call a special membership meeting to propose that one or more members of the Corporation be given a credit toward payment of their maintenance charges.  Such proposal will contain the terms and conditions for the granting of a credit.  A determination to grant a rent credit, and the terms and conditions of the grant, will require the approval of at least 66-2/3% of all the members of the Corporation.  Any vote to grant a rent credit will be binding on all members, regardless of how they vote on the issue.

A special membership meeting for this purpose may also be convened in the manner provided in Article III, Section 3 of the By-Laws.

9

P-60 (3-85)

Section 12.  House Rules

The Board may, from time to time, adopt and amend such House Rules as it may deem necessary in respect to the apartment building of the Corporation for the health, safety, convenience and enjoyment of the shareholders.  Copies of the House Rules and of any changes in them shall be furnished to each shareholder.

ARTICLE V

OFFICERS

Section 1.  Designation

The principal officers of the Corporation shall be a President, a Vice President, a Secretary, and a Treasurer, all of whom shall be elected by the Board.  Only shareholders who satisfy the qualifications for Directors as set forth in Article IV, Section 1, shall be eligible to be officers of the Corporation. The Board may appoint an assistant treasurer, an assistant secretary, and such other officers as in their judgment may be necessary.  The offices of Treasurer and Secretary may be filled by the same person.  The offices of President and Secretary may not be held by the same person.

Section 2.  Election of Officers

The officers of the Corporation shall be elected by the Board at the first meeting of the Board following the annual meeting of the shareholders, and shall hold office for a one year term and until their successors have been elected and qualified.

10

P.61 (3.85)

## Section 3.  Removal of Officers

Upon an affirmative vote of a majority of the shareholders or the Board at a regular or special meeting duly called, any officer may be removed, either with or without cause, and a successor elected.

## Section 4.  President

The President shall be chief executive officer of the Corporation.  He or she shall preside at all meetings of the shareholders and of the Board.  He or she shall have all of the general powers and duties which are usually vested in the office of president of a corporation, including but not limited to the powers to appoint committees from among the shareholders from time to time as he or she may decide is appropriate to assist in the conduct of the affairs of the Corporation.

## Section 5.  Vice President

The Vice President shall take the place of the President and perform those duties whenever the President shall be absent or un-able to act.  If neither the President nor the Vice President is able to act, the Board shall appoint some other shareholder of the Board to act on an interim basis.  The Vice President shall per-form some other duties as shall from time to time be determined by the Board.

Section 6.  Secretary

The Secretary shall keep the minutes of all meetings of the Board and the minutes of all meetings of the shareholders of the Corporation; he or she shall give notice of all meetings of shareholders and directors; and have custody of the seal of the Corporation, the record of shares, proprietary leases, and of such other books and papers as the Board may direct; and in general, perform all the duties incident to the office of Secretary.

Section 7.  Treasurer

The Treasurer shall have responsibility for corporate funds and securities and shall be responsible for keeping full and accurate accounts of all receipts and disbursements in books belonging to the Corporation.  He or she shall be responsible for the deposit of all moneys and other valuable effects in the name, and to the credit, of the Corporation in such places as may from time to time be designated by the Board and perform all other duties and acts incident to the office of Treasurer.

ARTICLE VI

PROPRIETARY LEASE

Section 1.  Form of Lease

A.  The Board shall adopt a form of Proprietary Lease to be used by the Corporation for the leasing of all apartments to shareholders and other space in the apartment building.  Proprietary Leases shall be for such terms, with or without provisions

for renewals, and shall contain such restrictions, limitations and provisions in respect to the assignment thereof, the subletting of the premises demised thereby, and such other terms, provisions, conditions and covenants as the Board may determine, consistent with any provisions of the Certificate of Incorporation.

B.   After a Proprietary Lease in the form adopted by the Board shall have been executed and delivered by the Corporation, all Proprietary Leases subsequently executed and delivered shall be in the same form, except with respect to the statement as to the name of the lessee and the date of the commencement of the term, and any change or alteration thereafter must be approved by the shareholders in accordance with the requirements of the Proprietary Lease and shall be made in and shall apply to all Proprietary Leases of the Corporation.


## Section 2.   Assignment

Proprietary Leases shall be assigned or transferred only in compliance with the terms, conditions or provisions of the Proprietary Lease and the Certificate of Incorporation.   A duplicate original of each Proprietary Lease shall always be kept on file in the principal office of the Corporation.

The Board shall supervise the assignment of proprietary leases and the transfer of shares in such a manner as to implement the rules and restrictions established for assignments and transfers in the Certificate of Incorporation.

## Section 3.   Allocation of Shares

The Board shall allocate to each apartment in the apartment building of the Corporation to be leased to shareholders-tenants under proprietary leases, the number of shares of the corporation which must be owned by the proprietary lessee of such apartment.

## Section 4.   Fees on Assignment

The Board shall have authority before any assignment, sublet or surrender of a Proprietary Lease to fix a reasonable fee to cover actual expenses and attorney's fees of the Corporation, and a service fee of the Corporation in connection with each such proposed assignment, sublease or surrender.

## Section 5.   Lost Proprietary Leases

In the event any Proprietary Lease in force is lost, stolen, destroyed, or mutilated, the Board may authorize the issuance of a new Proprietary Lease in the same form and with the same terms, provisions, conditions and limitations.  The Board may, in its discretion, before the issuance of any such new Proprietary Lease, require the owner, or the legal representative of such owner, to make an affidavit or affirmation setting forth such facts as to the loss, destruction, or mutilation as it deems necesary, and to give the Corporation a bond, in such reasonable sum as it directs, indemnifying the Corporation against any liability or loss it may sustain by reason of the issuance of such new Proprietary Lease.

## ARTICLE VII

### CAPITAL SHARES

#### Section 1.  Issuance to Shareholders Only

No shares of the Corporation shall be issued or reissued except in connection with the execution by the purchaser and delivery by the Corporation of a Proprietary Lease of an apartment in the building owned by the Corporation.  The ownership of shares shall entitle the holder thereof to occupy the apartment for the purposes specified in the Proprietary Lease to which the shares are allocated, subject to the provisions, covenants, and agreements contained in the such Proprietary Lease.

#### Section 2.  Issuance of Certificates

Shares appurtenant to each Proprietary Lease shall be issued in the amount allocated by the Board to the apartment described in the Proprietary Lease and shall be represented by a single Certificate.

#### Section 3.  Form and Share Register

Certificates of the shares of the Corporation shall be in the form adopted by the Board and shall be signed by the President or a Vice-President, and the Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer, shall be sealed with the seal of the Corporation, and shall be numbered in the order in which issued.  The signatures and seal may be facsimiles when and to the extent permitted by applicable statutory provisions.  Certificates shall be issued in consecutive order, and there shall be recorded the name of the person holding the shares, the number

15

of shares, and the date of issue.   Each Certificate exchanged or returned to the Corporation shall be canceled, the date of cancellation shall be indicated thereon, and such Certificate shall be retained in the corporate records.

## Section 4.   Transfers

Transfers of shares shall be made on the books of the Corporation by the holder in person or by power of attorney, and shall be duly executed and filed by the Secretary of the Corporation  on the surrender of the Certificate, except that shares sold by the Corporation to satisfy any lien it holds on the shares may be transferred without the surrender of the Certificate representing the shares.  The Board shall supervise the transfer of shares in such a manner as to implement the rules and restrictions established for transfers in the Certificate of Incorporation.

## Section 5.   Units of Issuance

Unless and until all Proprietary Leases executed by the Corporation have been terminated, the shares allocated to each Proprietary Lease shall not be sold or assigned except as an entirety to the Corporation or an assignee of the Proprietary Lease, after satisfying the requirements of the Proprietary Lease in respect to the assignment.

Section 6.  Corporation's Lien

The Corporation shall at all times have a first lien on the shares owned by each shareholder for all sums due and to be due the Corporation from the shareholder, including, without limitation, obligations arising under the provisions of any proprietary lease issued by the Corporation and held at any time by the shareholder.  Unless and until the shareholder, as lessee, defaults in the payment of any rent or of any other indebtedness or obligation, or defaults in the performance of any of the covenants or conditions contained in the proprietary lease, the shares shall continue to stand in the name of the shareholder on the books of the Corporation, and the shareholder shall be entitled to vote such shares as though the lien did not exist.  On the enforcement of the lien by the Corporation, the Corporation shall have the right to issue to any purchaser of the shares, a Certificate of the shares so purchased, substantially similar to the Certificate issued to the defaulting shareholder and thereupon the Certificate for shares previously issued to the defaulting shareholder shall become void.  The defaulting shareholder agrees to surrender the Certificate to the Corporation on demand, but the failure of the defaulting shareholder to surrender the Certificate shall not affect the validity of the Certificate issued in replacement of the original.  The Corporation may refuse to consent to the transfer of shares of any shareholder indebted to the Corporation unless and until the indebtedness is paid.

P.68 (3.85)

**Section 7.**  _Lost Certificates_

In the event any share Certificate is lost, stolen, destroyed, or mutilated, the Board may authorize the issuance of a new Certificate substantially similar and for the same number of shares in lieu thereof.  The Board may, in its discretion, before the issuance of any new Certificate, require the owner of the lost, stolen, destroyed, or mutilated Certificate, or the legal representative of the owner, to make an affidavit or affirmation setting forth such facts as to the loss, destruction, or mutilation as it deems necesary, and to give the Corporation a bond in such reasonable amount as it may direct, indemnifying the Corporation against any liability or loss it may sustain by reason of the issuance of such new Certificate.

**Section 8.**  _Legend on Share Certificate_

Certificates representing shares in the Corporation shall bear a legend reading as follows:

The rights of any holder of this Certificate are subject to the provisions of the Certificate of Incorporation and the By-Laws of this Corporation and to all the terms, covenants, conditions and provisions of a Proprietary Lease made between the person in whose name this Certificate is issued, as lessee, and this Corporation, as lessor, for an apartment in the premises, located at _____,
which lease limits and restricts the title and rights of any transferee of this Certificate.

The shares represented by this Certificate are transfer-
able only in accordance with restrictions contained in the
Certificate of Incorporation, only as an entirety and only to
an approved assignee of the proprietary lease to which these
shares are allocated.

Copies of the Certificate of Incorporation, the By-Laws
and the proprietary lease are on file and available for in-
spection at the office of this Corporation at

_____
Address

The Directors of this Corporation may refuse to consent to
the transfer of the shares represented by this Certificate
until any indebtedness of the shareholder to this Corporation
is paid.  This Corporation, by the terms of the By-Laws and
proprietary lease, has a first lien on the shares represented
by this Certificate for all sums due and to become due under
the proprietary lease.


ARTICLE VIII

SEAL

The seal of the Corporation shall be circular in form and
have inscribed thereon the name of the Corporation, the year of
its organization and the words "Corporate Seal" and "New York."
The seal shall be kept by the secretary.  If directed by the
Board, a duplicate of the seal may be kept and used by the
Treasurer or any assistant secretary or assistant treasurer.

# ARTICLE IX

## FISCAL MANAGEMENT

### Section 1.   Fiscal Year

The fiscal year of the Corporation shall be the calendar year unless otherwise determined by resolution of the Board.

### Section 2.   Books and Accounts

Books and accounts of the Corporation shall be kept under the direction of the Treasurer and in accordance with generally accepted accounting procedures.

### Section 3.   Auditing and Annual Reports

At the close of each fiscal year, the books and records of the Corporation shall be audited by a Certified Public Accountant or such other person approved by the Board or shareholders. Based on such reports, the Corporation will furnish the shareholders with an annual financial statement, including the income and disbursements of the Corporation. The Corporation will also give the shareholders as soon as practicable after the end of each calendar year, but in no event later than March 5th, a statement showing each member's pro rata share of the real estate taxes and mortgage interest paid by the Corporation during the preceding calendar year.

## Section 4.   Fidelity Bonds

The Board may require that all officers and employees of the Corporation handling or responsible for Corporate or trust funds shall furnish adequate fidelity bonds.  The premiums on such bonds shall be paid by the Corporation.

## Section 5.   Place of Keeping Books

Unless otherwise expressly required by statute, the Corporation shall keep its books and records of account and minutes of the proceedings of its shareholders and Board at its principal office in the State of New York.  Minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

## Section 6.   Examination of Books

The books, records, documents and accounts of the Corporation, shall be open to inspection by shareholders, at reasonable times, at the office of the Corporation.

## Section 7.   Deposit of Funds

All funds of the Corporation not otherwise employed shall be deposited in such banks or trust companies or other places as the Board may determine from time to time.

## Section 8.  Safe Deposit Boxes

Any officer or officers as from time to time shall be designated by the Board, shall have access to any safe of the Corporation in the vault of any safe deposit company.

## Section 9.  Execution of Corporate Documents

With the prior authorization of the Board, all notes and contracts, including Proprietary Leases, shall be executed on behalf of the Corporation by either the President or the Vice President and by either the Secretary or Treasurer, and all checks shall be executed on behalf of the Corporation by either the President or the Vice President, and countersigned by either the Secretary or Treasurer, and all deeds shall be executed on behalf of the Corporation by either the President or Vice President. Such Board authorization may be general or confined to specific instances.

## ARTICLE X

### COMPENSATION OF AND TRANSACTIONS WITH

### DIRECTORS AND OFFICERS

## Section 1.  Compensation

No compensation shall be paid to Directors or officers for their services as Directors or officers, respectively. No remuneration shall be paid to a Director or officer for services performed by them for the Corporation in any other capacity, unless a resolution authorizing such remuneration is unanimously adopted by the Board before the services are undertaken.

P.73 (3.85)

22

## Section 2.   Loans to Directors and Officers

The Corporation shall make no loans to any of its share-holders, Directors or officers, or to any other corporation, firm, association or other entity in which one or more of its share-holders, Directors or officers are Directors or officers or has substantial financial interest.

## Section 3.   Dividends to Members, Directors and Officers

The Corporation shall not pay dividends or distribute any part of its income or profits to any of its shareholders, Directors or officers.

## Section 4.   Contracts with, Directors and Officers

No Director or officer of the Corporation shall be inter-ested, directly or indirectly, in any contract relating to the operations conducted by it, nor in any contract for furnishing services or supplies to it, unless:

1)  such contract shall be authorized by the Board (without counting the vote of such interested Director) and such interest shall have been disclosed or known to the Board; or

2)  such contract shall be authorized by the shareholders and such interest shall have been disclosed or known to the shareholders.

If there was no disclosure, knowledge or vote as provided in (1) and (2) above, the Corporation may void the contract or

P.74 (3.85)

22

transaction unless the party or parties thereto establish affirmatively that the contract or transaction was fair and reasonable to the Corporation at the time it was authorized by the Board or the shareholders.

Interested directors may be counted in determining the presence of a quorum at a meeting of the Board or shareholders which authorizes such contract or transaction but in no event may they vote on the issue.

## ARTICLE XI

Section 1.   Indemnification

The Corporation shall provide indemnification of its Directors and officers to the fullest extent permitted by Section 721 through 726 of the Business Corporation Law except in relation to matters as to which such Director or officer is adjudged to have breached his duty to the Corporation.

## ARTICLE XII

### AMENDMENT

Section 1.   Amendment and Repeal

Unless otherwise provided in the Certificate of Incorporation, By-Laws may be adopted, amended or repealed by a majority vote of the shareholders at any annual or special meeting, provided that the proposed amendment or the substance thereof shall have been inserted in the notice of meeting or that all the shareholders be present in person or by proxy.

P.75 (3.85)

24

## Section 2.   Construction

The decision of the Board shall be conclusive on all questions of construction of these By-Laws except as otherwise expressly provided in the Certificate of Incorporation or the Proprietary Lease.

P.76 (3.85)

CERTIFICATE OF INCORPORATION

OF

94-102 HAMILTON PLACE
HOUSING DEVELOPMENT FUND CORPORATION

under Section 402 of the Business Corporation Law and Article XI of the Private Housing Finance Law

The undersigned, acting as incorporator of a corporation under Section 402 of the Business Corporation Law and Article XI of the Private Housing Finance Law, hereby adopts the following Certificate of Incorporation for such Corporation:

I

The name of the corporation is the 94-102 Hamilton Place HOUSING DEVELOPMENT FUND CORPORATION (referred to in this Certificate as the "Corporation").

II

The Corporation is organized exclusively for the purpose of developing a housing project for persons of low income located at 94-102 Hamilton Place                    , New York. The Corporation is empowered to do and perform all acts necessary to accomplish the above mentioned corporate purposes, including, but not limited to:   (a) the purchase or lease of real property and the execution of such instruments and undertakings as may be required by any governmental body giving assistance to the Corporation and (b) making available to shareholders of the Corporation apartments, space and facilities located in such property for residential purposes under leases commonly known as proprietary leases.   Said proprietary leases provide that shareholders of the Corporation shall be entitled, solely by reason of their ownership of shares of the Corporation, to occupy the aforementioned apartments, space and facilities for residential purposes, pursuant to such proprietary leases.

III

The principal office of the Corporation is to be located in the City of New York, County of New York          , and State of New York and all meetings of the Board of Directors are to be held in the State of New York.

IV

The Secretary of the State of New York is designated the agent of the Corporation on whom process against the Corporation may be served.   The post office address to which the Secretary of State shall mail a copy of any process served against the Corporation is  94-102 Hamilton Place HDFC

94 Hamilton Place
New York, N.Y. 10031

V

The Corporation is authorized to issue only one class of stock. The total number of shares which the Corporation shall have authority to issue is 13,500 with a par value of One Dollar ($1.00) per share.

VI

The housing project of the Corporation shall be operated exclusively for the benefit of persons or families who are entitled to occupancy in the housing project by reason of ownership of shares in the Corporation, and the Corporation may issue shares for home owners' purchase notes if the purchase transaction has received the written endorsement of the Commissioner of Housing and Community Renewal of the State of New York and if at least two hundred dollars in money or property is received by the Corporation toward the issuance of such shares.

VII

If the Corporation receives a temporary loan or advance from the Municipal Housing Development Fund, as established by or pursuant to Article XI of the Private Housing Finance Law, it shall be authorized to enter into an agreement ("Regulatory Agreement") with the Department of Housing Preservation and Development of the City of New York ("HPD") providing for the regulation of rents, profits, dividends and the disposition of property or franchises for the term during which the mortgage or advance remains unpaid; and that during the term of a Regulatory Agreement, the property or franchises of the Corporation may be disposed of only with the consent of HPD; and HPD shall have the power, if it determines that any such temporary loan or advance is in jeopardy of not being repaid, or that the proposed housing project for which such temporary loan or advance was made is in jeopardy of not being constructed, to appoint to the Board of Directors of the Corporation as many new directors as will be sufficient to constitute a majority of the Board, and which directors need not be shareholders of the Corporation or meet other qualifications enumerated in the Certificate of Incorporation or the By-Laws of the Corporation.

VIII

Notwithstanding any other provision contained herein, the Corporation is authorized to enter into a contract with the Secretary of the United States Department of Housing and Urban Development (hereinafter referred to as the "Secretary") and shall be bound by the terms thereof to enable the Secretary to carry out the provisions of the National Housing Act and the United States Housing Act of 1937 as amended. Upon execution, the Contract shall be binding upon the Corporation, its successors and assigns, so long as a mortgage is outstanding, unpaid and insured, or held by the Secretary, or any rent subsidy pursuant to the United States Housing Act of 1937 as amended is payable.

IX

All income and earnings of the Corporation shall be used exclusively for corporate purposes, and no part of the net income or net earnings of the Corporation shall inure to the benefit or profit of any private individual, firm, corporation or association.

X

Notwithstanding any other provision contained herein, the following restrictions upon the use and sale of the housing project (the building) as a whole and upon the transfer of shares allocated to individual units shall apply:

A.  The building shall provide housing for persons and families of low income as defined in Section 576 of Article XI of the Private Housing Finance Law;

B.  For fifteen years from the date of the conveyance of title to the building to the Corporation by the City of New York, the Corporation shall not sell, transfer, exchange, mortgage or otherwise dispose of or lease all or substantially all of the building without the prior written approval of the Commissioner of HPD.

C.  Within the first three years from the date of the original conveyance by the City to the Corporation, if an individual tenant co-operator sells his or her shares in the Corporation, he or she may retain the following from the sales price:

   1.  The original purchase price;

   2.  The amount of special assessments for building-wide capital improvements, if any, that the Corporation has levied upon the selling co-operator;

   3.  The entire balance of the purchase price, if any, will be retained by the Corporation as a reserve for capital and operating expenses.

D.  After three years from the date of the original conveyance by the City, and for the remainder of the fifteen year period referred to in (B), a selling tenant

co-operator may retain the following from the sales price;

1. The original purchase price;

2. The amount of special assessments for building-wide capital improvements, if any, that the Corporation has levied upon the selling tenant co-operator;

3. The amount spent for capital improvements to the individual unit, up to $1,500.00, that the selling tenant co-operator can document to the Corporation's satisfaction.

4. From the balance of the sales price, if any, the selling tenant co-operator may retain up to 30 percent. The Corporation will retain at least 70 percent of the balance as a reserve for capital and operating expenses;

5. The Corporation may further limit the portion and amount of the sales price to be retained by selling tenant co-operators as outlined in 3 and 4 by amending its by-laws by vote of 66 2/3 percent of the shareholders and by distributing such amendments in writing to all shareholders.

E. The provisions of Article X as set forth herein may not be altered by the Corporation except as set forth herein, or except as approved by HPD.

### XI

At every meeting of the shareholders, each shareholder present, either in person or by proxy, shall have the right to cast only one vote on each question without regard to the number of shares held by the shareholder. No shareholder shall be eligible to vote or to serve on the Board of Directors who is shown on the books or management accounts of the Corporation to be two months delinquent in payments due the Corporation under the Proprietary Lease. The Directors shall be elected by a majority vote of the shareholders of the Corporation.

### XII

The Corporation may not be dissolved without the written consent of the Commissioner of HPD. Such consent must be attached to the "Certificate of Dissolution" which the Corporation will file with the Department of State.

4

XIII

No holder of any shares of the Corporation shall be entitled (either conditionally or unconditionally) to receive any distri- bution not out of earnings and profits of the Corporation except on a complete or partial liquidation of the Corporation.  Nothing herein shall affect the application of Article IX of this Certificate.

XIV

Annexed hereto or endorsed hereon are copies of all approvals and consents required by Article XI of the Private Housing Finance Law for filing this Certificate with the Secretary of State.

XV

This Certificate may not be altered or amended without the written consent of HPD, and may not be amended without the written approval of the Secretary so long as a mortgage on any real pro- perty of the Corporation is outstanding, unpaid and held by the United States Department of Housing and Urban Development.

XVI

A copy of this Certificate of Incorporation and a copy of the filing receipt issued by the Department of State, Division of Corporation, shall be delivered to the Commissioner of HPD when such filing receipt is received.

XVII

The organizational meeting shall be held within ninety days of the date on which the Corporation acquires title to the prop- erty on which the housing project is located.

XVIII

The subscriber to this Certificate is at least eighteen years of age and is a resident of the State of New York.

IN WITNESS WHEREOF, for the purpose of forming the Corpora- tion under the laws of the State of New York, I, the undersigned, the incorporator of this Corporation, have personally executed this Certificate of Incorporation on December 6, 1984.


_Katherine Sherwood_
Katherine Sherwood
75 Maiden Lane, 5th Floor
New York, New York 10038

STATE OF NEW YORK )

                   ) ss.:

(COUNTY OF NEW YORK)

On the 6th day of December , 1984, before me personally came Katherine Sherwood to me known to be the person described in and who executed the foregoing Certificate of Incorporation and he thereupon duly acknowledged that he executed the same.

*Barbara Roslyn*

NOTARY PUBLIC

BARBARA D. ROSLYN
Notary Public, State of New York
No. 4752348
Qualified in New York County
Commission Expires March 30, 1985

## CERTIFICATE OF HPD APPROVAL
## AND CONSENT

I, Joseph Shuldiner, Deputy Commissioner of the Department of Housing Preservation and Development of The City of New York, for the purpose of, and as provided by, Article XI of the Private Housing Finance Law of the State of New York; and pursuant to said Article XI, hereby certify that I approve the Certificate of Incorporation of 94-102 Hamilton Place Housing Development Fund Corporation and consent to its filing with the Secretary of State of the State of New York.

Joseph Shuldiner, Deputy Commissioner, Department of Housing Preservation and Development



455348

E 174789

94-102 Hamilton Place

HOUSING DEVELOPMENT FUND CORPORATION

CERTIFICATE OF

INCORPORATION

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED DEC 20 1994
AMT. OF CHECK $
FILING FEE $
TAX $
COUNTY FEE $
COPY $
CERT $
REFUND $
SPEC HANDLE $
BY

DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT
LEGAL AFFAIRS
75 Maiden Lane, 9th Floor
New York, New York 10038

806-8124

BLOCK 2073    LOT 20

Application

No. _____ 19___

LOCATION 94 N Hamilton Pl.

BOROUGH Man

Please check    Plans ☒    Applications ☐

☐ Examination  ☐ Amendment  ☐ Cancellation  ☐ Reconsideration  ☐ Permit

**WARNING**

ANY PERSON REMOVING PLANS OR OTHER RECORDS FROM THE JURISDICTION OF THIS DEPARTMENT WILL BE PROSECUTED TO THE FULL EXTENT OF THE LAW.

Please deliver to the undersigned the following public records for

(Please print)

Name William Crowder

Firm or Agency 90-102 Hamilton Pl. HDFC

Address 94 N Hamilton Pl., N.Y.

Relationship to property Proj. dir.

Owner, Lessee, Architect, Engineer, Attorney, Agent, Contractor, Plumber, etc.

_____ (Signature)

Record(s) Received _____ (Signature) Date/Time

Record(s) Issued _____ (Signature) Date/Time

DEPARTMENT OF BUILDINGS

CITY OF NEW YORK

BOROUGH OF MANHATTAN

---

PURCHASER

**CREDIT** ACCT. NO. 2000CB — CASHIER'S CHECK

FREEDOM NATIONAL BANK OF NEW YORK

S/A#51-08-037570-2 closed

72577

November 7, 1985    1-434 / 260

PAY TO THE ORDER OF ******************Commissioner of Finance***************** $13,500.00

**************THIRTEEN THOUSAND FIVE HUNDRED AND 00/100************ DOLLARS

FOR _____

Re:90-102 Hamilton Place

CREDIT CASHIER'S CHECKS

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

New York, New York 10013

## PROPRIETARY LEASE

**PROPRIETARY LEASE**, made as of _____, 19___, by and between _____, a New York corporation, having an office at _____, New York, herinafter called the Lessor, and _____, hereinafter called the Lessee.

WHEREAS, the Lessor is the Owner of the Leasehold affecting the land and the building erected thereon in the City, County and State of New York known as and by the street number _____, New York, hereinafter called the building; and

WHEREAS, the Lessee is either the holder of a membership certificate or shares of the Lessor, to which this lease is appurtenant and which has or have been allocated to Apartment _____ in the building;

**Demised Premises**

NOW, THEREFORE, in consideration of the premises, the Lessor hereby leases to the Lessee, and the Lessee hires from the Lessor, subject to the terms and conditions hereof, Apartment _____ in the building (hereinafter referred to as the apartment) for a term

**Term**

from _____, 19___, until _____, 20___, (unless sooner terminated as hereinafter provided). As used herein "the apartment" means the rooms in the building as partitioned on the date of the execution of this lease designated by the above-stated apartment number, together with their appurtenances and fixtures and any closets, terraces, balconies, roof, or portion thereof outside of said partitioned rooms, which are allocated exclusively to the occupant of the apartment.

**Rent (Maintenance) How Fixed**

1.(a) The rent (sometimes called maintenance) payable by the Lessee for each year, or portion of a year, during the term shall equal that proportion of the Lessor's maintenance and operating expenses for such year or portion of a year, which the number of rooms in the apartment bears to the total number of rooms in all of the apartments in the building on the date of the determination of such maintenance and operating expenses. Such rent shall be payable in equal monthly installments in advance on the first day of each month, unless the Board of Directors of the Lessor (hereinafter called Directors) at the time of its determination of the maintenance and operating expenses shall otherwise direct. The Lessee shall also pay such additional rent as may be provided for herein when due.

**Accompanying Membership Certificates or Shares to be Specified in Proprietary Leases**

(b) In every proprietary lease heretofore executed by the Lessor, there has been, and in every proprietary lease hereafter executed by it there will be, one membership certificate or the appropriate number of shares of the Lessor issued to a Lessee simultaneously therewith.

EXHIBIT 5

2

**Maintenance and Operating Expenses Defined**

(c) "Maintenance and Operating Expenses" whenever used herein shall mean the estimated amount in cash which the Directors shall from time to time in its judgment determine to be necessary or proper for (1) the operation, maintenance, care, alteration and improvement of the corporate property during the year or portion of the year for which such determination is made; (2) the creation of such reserve for contingencies as it may deem proper; and (3) the payment of any obligations, liabilities or expenses incurred or to be incurred, after giving consideration to (i) income expected to be received during such period (other than rent from proprietary leases), and (ii) cash on hand which the Directors in its discretion may choose to apply. The Directors may from time to time modify its prior determination and increase or diminish the amount previously determined as maintenance or operating expenses of the corporation for a year or a portion thereof. No determination of maintenance and operating expenses shall have any retroactive effect on the amount of the rent payable by the lessee for any period prior to the date of such determination. All determinations of maintainance and operating expenses shall be binding on all lessees.

**Authority Limited to Board of Directors**

(d) Whenever in this paragraph or in any other paragraph of this lease, a power or privilege is given to the Directors, the same may be exercised only by the Directors, and in no event may any such power or privilege be exercised by a creditor, receiver or trustee.

**Issuance of Additional Membership Certificates or Shares**

(e) If the Lessor shall hereafter issue membership certificates or shares (whether now or hereafter authorized) in addition to those issued on the date of the execution of this lease, the holders of the membership certificates or shares hereafter issued shall be obligated to pay rent at the same rate as other proprietary lessees from and after the date of issuance. If any such membership certificates or shares are issued on a date other than the first or last day of the month, the rent for the month in which issued shall be apportioned. The maintenance and operating expenses as last determined shall, upon the issuance of such membership certificates or shares, be deemed increased by an amount equal to such rent.

**Fund Balance or Paid-in Surplus**

(f) The Directors may from time to time as may be proper determine how much of the maintenance and other receipts, when received (but not more than such amount as represents payments on account of principal of mortgages on the property and other capital expenditures), shall be credited on the corporate accounts to the "Fund Balance" or "Paid-in Surplus." Unless the Directors shall determine otherwise, the amount of payments on account of principal of any mortgages shall be credited to the Fund Balance or Paid-in Surplus.

**Failure to Fix Maintenance and Operating Expenses**

(g) The failure of the Directors to determine the Lessor's maintenance and operating expenses for any year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof, or a release of the Lessee from the obligation to pay the rent or any installment thereof, but the rent computed on the basis of the maintenance and operating expenses as last determined for any year or portion thereof shall thereafter continue to be the maintenance until a new determination of maintenance and operating expenses shall be made.

Lessor's
Repairs

2.  The Lessor shall at its expense keep in good repair all of the building including all of the apartments, the sidewalks and courts surrounding the same, and its equipment and apparatus except those portions the maintenance and repair of which are expressly stated to be the responsibility of the Lessee pursuant to Paragraph 18 hereof.

Services
by Lessor

3.  The Lessor shall maintain and manage the building in a habitable condition and shall keep the elevators and the public halls, cellars and stairways clean and properly lighted and heated, and shall provide the number of attendants requisite, in the judgment of the Directors, for the proper care and service of the building, and shall provide the apartment with a proper and sufficient supply of hot and cold water and of heat, and if there be central air conditioning equipment supplied by the Lessor, air conditioning when deemed appropriate by the Directors.  The covenants by the Lessor herein contained are subject, however, to the discretionary power of the Directors to determine from time to time what services and what attendants shall be proper and the manner of maintaining the operation of the building, and also what existing services shall be increased, reduced, changed, modified or terminated.

Damage to
Apartment
or Building

4.(a)  If the apartment or the means of access thereto or the building shall be damaged by fire or other cause covered by multi-peril policies commonly carried by cooperative corporations in New York City (any other damage to be repaired by Lessor or Lessee pursuant to Paragraphs 2 and 18. as the case may be), the Lessor shall at its own cost and expense, with reasonable dispatch after receipt of notice of said damage, repair or replace or cause to be repaired or replaced, with materials of a kind and quality then customary in buildings of the type of the building, the building, the apartment and the means of access thereto, including the walls, floors, ceilings, pipes, wiring, and conduits in the apartment.  Anything in this Paragraph or Paragraph 2 to the contrary, Lessor shall not be required to repair or replace, or cause to be repaired or replaced, equipment, fixtures, furniture, furnishings or decorations installed by the Lessee or any of his or her predecessors in title nor shall the Lessor be obligated to repaint or replace wallpaper or other decorations in apartments.

Rent
Abatement

(b)  In case the damage resulting from fire or other cause shall be so extensive as to render the apartment partly or wholly untenantable, or if the means of access thereto shall be destroyed, the rent hereunder shall proportionately abate until the apartment shall again be rendered wholly tenantable or the means of access restored; but if said damage shall be caused by the act or negligence of the Lessee or the agents, employees, guests, roommate or family members of the Lessee or any occupant of the apartment, such rental shall abate only to the extent of the rental value insurance, if any, collected by Lessor with respect to the apartment.

Expiration
of Lease Due
to Damage

(c)  If the Directors shall determine that (i) the building is totally destroyed by fire or other cause, or (ii) the building is so damaged that it cannot be repaired within a reasonable time after the loss shall have been adjusted with the insurance carriers, or (iii) the destruction or damage was caused by hazards which are not

covered under the Lessor's insurance policies then in effect, and if in any such case, at least two-thirds of the members or shareholders, at a member's or shareholder's meeting duly called for that purpose, held within 120 days after the determination by the Directors, shall vote not to repair, restore or rebuild, then upon giving of notice pursuant to Paragraph 31 hereof, this Lease and all other proprietary leases and all right, title and interest of the parties thereunder and the tenancies thereby created, shall thereupon wholly cease and expire and rent shall be paid to the date of such destruction or damage. The Lessee hereby waives any and all rights under Section 227 of the Real Property Law and in no event shall the Lessee have any option or right to terminate this Lease.

**Waiver of Subrogation (Waiver of the Insurer's Ability to Succeed to the Insured's Rights Against the Party who Caused the Loss)**

(d)  Lessor agrees to use its best efforts to obtain a provision in all insurance policies carried by it waiving the right of subrogation against the Lessee; and, to the extent that any loss or damage is covered by the Lessor by any insurance policies which contain such waiver of subrogation, the Lessor releases the Lessee from any liability with respect to such loss or damage.  In the event that the Lessee suffers loss or damage for which Lessor would be liable, and Lessee carries insurance which covers such loss or damage and such insurance policy or policies contain a waiver of subrogation against the Landlord, then in such event Lessee releases Lessor from any liability with respect to such loss or damage.

**Inspection of Books of Account**

5.    The Lessor shall keep full and correct books of account at its principal office or at such other place as the Directors may from time to time determine, and the same shall be open during all reasonable hours to inspection by the Lessee or a representative of the Lessee. The Lessor shall deliver to the Lessee within a reasonable time after the end of each fiscal year an annual report of corporate financial affairs, including a balance sheet and a statement of income and expenses, verified by the president and treasurer or by a majority of the Directors, or certified by an independent public or certified public accountant.

**Annual Report**

**Changes in Terms and Conditions of Leases**

6.    Each proprietary lease shall be in the form of this lease, unless a variation of any lease is authorized by at least two-thirds of the members or shareholders and the Lessee affected.  The form and provisions of all the proprietary leases then in effect and thereafter to be executed may be changed by the approval of at least two-thirds of the members or shareholders, and such changes shall be binding on all Lessees even if they did not vote for such changes, except that the proportionate share of rent or maintenance and operating expenses payable by any Lessee may not be increased unless as otherwise provided in the Lessor's corporate by-laws, nor may any Lessee's right to cancel the lease under the conditions set forth in Paragraph 35 be eliminated or impaired without his or her express consent. Approval by Lessees as provided for herein shall be evidenced by written consent or by affirmative vote taken at a meeting called for such purpose.

**Penthouses,
Terraces and
Balconies**

7. If the apartment includes a terrace, balcony, or a portion of the roof adjoining a penthouse, the Lessee shall have and enjoy the exclusive use of the terrace or balcony or that portion of the roof adjoining the penthouse, subject to the applicable provisions of this lease and to the use of the terrace, balcony or roof by the Lessor to the extent herein permitted. The Lessee's use thereof shall be subject to such regulations as may, from time to time, be prescribed by the Directors. The Lessor shall have the right to erect equipment on the roof, including radio and television aerials and antennas, for its use and the use of the lessees in the building and shall have the right of access thereto for such installations and for the repair thereof. The Lessee shall keep the terrace, balcony, or portion of the roof adjoining his apartment clean and free from snow, ice, leaves and other debris and shall maintain all screens and drain boxes in good condition. No planting, fences, structures or lattices shall be erected or installed on the terraces, balconies or the roof of the building without the prior written approval of the Lessor. No cooking shall be permitted on any terraces, balconies or the roof of the building, nor shall the walls thereof be painted by the Lessee without the prior written approval of the Lessor. Any planting or other structures erected by the Lessee or his predecessor in interest may be removed and restored by the Lessor at the expense of the Lessee for the purpose of repairs, upkeep or maintenance of the building.

**Assignment of
Lessor's Rights
Against
Occupant**

8. If at the date of the commencement of this lease, any third party shall be in possession or have the right to possession of the apartment, then the Lessor hereby assigns to the Lessee all of the Lessor's rights against said third party from and after the date of the commencement of the term hereof, and the Lessee by the execution hereof assumes all of the Lessor's obligations to said third party from said date. The Lessor agrees to cooperate with the Lessee, but at the Lessee's expense, in the enforcement of the Lessee's rights against said third party. If the rent (maintenance) of the Lessee is less than the rent received by the Lessee from such third party, the Lessee must pay the difference to the Lessor.

**Cancellation
of Prior
Agreement**

9. If at the date of the commencement of this lease, the Lessee has the right to possession of the apartment under any agreement or statutory tenancy, this lease shall supersede such agreement or statutory tenancy which shall be of no further effect after the date of commencement of this lease, except for claims theretofore arising thereunder.

**Quiet
Enjoyment**

10. The Lessee, upon paying the rent and performing the covenants and complying with the conditions on the part of the Lessee to be performed as herein set forth, shall, at all times during the term hereby granted, quietly have, hold and enjoy the apartment without any let, suit, trouble or hindrance from the Lessor, subject, however, to the rights of present tenants or occupants of the apartment, and subject to any and all mortgages and underlying leases of the land and building.

,8

Indemnity
  11.  The Lessee agrees to hold the Lessor harmless from all liability, loss, damage and expense arising from injury to person or property occasioned by the failure of the Lessee to comply with any provision hereof, or due wholly or in part to any act, default or omission of the Lessee or of any person dwelling or visiting in the apartment, or by the Lessor, its agents, servants or contractors when acting as agent for the Lessee as provided in this lease.  This Paragraph shall not apply to any loss or damage when Lessor is covered by insurance which provides for waiver of subrogation against the Lessee.

Payment of Rent
  12.  The Lessee will pay the rent to the Lessor upon the terms and at the times herein provided, without any deduction on account of any set-off or claim which the Lessee may have against the Lessor, and if the Lessee shall fail to pay any installment of rent promptly, the Lessee shall pay interest thereon at the maximum legal rate from the date when such installment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent hereunder.

House Rules
  13.  The Lessor has adopted House Rules which are appended hereto, and the Directors may alter, amend or repeal such House Rules and adopt new House Rules.  This lease shall be in all respects subject to such House Rules which, when a copy thereof has been furnished to the Lessee, shall be taken to be part hereof, and the Lessee hereby covenants to comply with all such House Rules and see that they are faithfully observed by the family, guests, employees, roommate and subtenants of the Lessee.  Breach of the House Rules shall be a default under this lease.  The Lessor shall not be responsible to the Lessee for the nonobservance or violation of House Rules by any other lessee or person.

Use of Premises
  14. (a)  The Lessee shall not, without the written consent of the Lessor on such conditions as Lessor may prescribe, occupy or use the apartment or permit it or any part of it to be occupied or used for any purpose other than as a private residence for the Lessee, Lessee's spouse, roommate, children, parents, brothers, sisters, grandparents, grandchildren and domestic employees; and in no event shall more than three adults occupy the apartment at a time for more than three months without the written consent of the Lessor.  In addition to the foregoing, the apartment may be occupied from time to time by guests of the Lessee for a period not exceeding three months, unless a longer period is approved by the Lessor in writing.

-79-

(b)   The Lessee must use the apartment as a primary residence, which is defined as follows: (i) (i) Lessee is domiciled in the City of New York ("City") at such apartment, or (ii) if not domiciled in the City, Lessee had spent an aggregate of more than 183 days in the preceding calendar year in the City at such apartment (unless such individual is in active service in the Armed Forces of the United States or began occupancy of the apartment during the preceding calendar year).   The Lessee may create a rebuttable presumption of primary residence by providing satisfactory proof that he or she has filed a New York City Resident Income Tax Return at such apartment for the most recent preceding calendar year.   If the apartment ceases to be the Lessee's primary residence, then no occupancy or use of the Lessee's apartment, including any sublease or assignment, which otherwise complies with this lease will be permitted.

Subletting        15.   Except as provided in Paragraph 38 of this Lease, the Lessee shall not sublet the whole or any part of the apartment for longer than three months or renew or extend any previously authorized Sublease for longer than three months without the consent of the Board of Directors given by a resolution of the Board or in writing by a majority of the Board, or, if the Board refuses or fails to give such consent, then with the consent of two-thirds of the Lessees who are members or shareholders, given either in writing or by affirmative vote taken at a meeting called for this purpose.   Any consent to


NO FURTHER TEXT ON THIS PAGE)


-79a-

within 30 days after submission of references to them or Lessor's agent, then by at least two-thirds of the members or shareholders. Consent by Lessees as provided for herein shall be evidenced by written consent or by affirmative vote taken at a meeting called for such purposes in the manner as provided in the by-laws.

**Consents: On Death of Lessee; Separation or Divorce**

(b) If the Lessee shall die, or leave the apartment pursuant to the terms of a legal separation or divorce, consent shall not be unreasonably withheld to an assignment of the lease and a transfer of the membership certificate or shares to a financially responsible member of the Lessee's family (other than the Lessee's spouse, as to whom no consent is required).

**Consents Generally: Power and Duties of Directors and Lessees**

(c) The Directors or Lessees may grant or withhold consent to an assignment at their sole discretion except that such discretion shall be exercised in conformance with Paragraph 46 of this lease and further that it shall not be unreasonably withheld in the case of a financially responsible member of Lessee's family (other than a spouse, as to whom no consent is required.)

**Release of Lessee Upon Assignment**

(d) If the lease shall be assigned in compliance herewith, Lessee-assignor shall have no further liability on any of the covenants of this lease to be thereafter performed.

**Further Assignment or Subletting**

(e) Regardless of any prior consent theretofore given, neither the Lessee nor his executor, nor administrator, nor any trustee or receiver of the property of the Lessee, nor anyone to whom the interests of the Lessee shall pass by law, shall be entitled further to assign this lease, or to sublet the apartment, or any part thereof, except upon compliance with the requirements of this lease.

**Statement By Lessor**

(f) If this lease is then in force and effect, Lessor will, upon request of Lessee, deliver to the assignee a written statement that this lease remains on the date thereof in force and effect; but no such statement shall be deemed an admission that there is no default under the lease.

17.(a) A pledge of this lease and the appurtenant membership certificate or shares shall not be a violation of this lease; but neither the pledgee nor any transferee shall be entitled to have the membership certificate or the shares

transferred or recorded on the books of the Lessor, nor to vote such membership certificate or the shares, nor to occupy or permit the occupancy by others of the apartment, nor to sell such membership certificate or shares or this lease, without first obtaining the consent of the Lessor, which shall not be unreasonably withheld and which will be granted in accordance with and after complying with all of the provisions of Paragraph 14, 15, 16, 46 and the restrictions contained in the Corporation's Certificate of Incorporation, as the case may be.  The acceptance by Lessor of payments by the pledgee or any transferee on account of rent or additional rent shall not constitute a waiver of the aforesaid provisions.  The provisions of this sub-paragraph (a) shall be subject to sub-paragraph (b) of this Paragraph 17.

(b)  The Lessee may pledge and assign this lease and the membership certificate or shares of the Lessor allocated to the apartment as security for a loan made to the Lessee by a bank, trust company, insurance company or other recognized lending institution ("the Lender") provided, however, that the membership certificate or the certificate representing the shares allocated to the apartment and this lease may be assigned to the Lender only as security for repayment of the loan. In the event of a default by the Lessee in

-81a-

(NO FURTHER TEXT ON THIS PAGE)

a[ ] of the terms, covenants, provisio[ ] [ ]r conditions of this lease, the Lessor will give written notice thereof to the Lender if written notice of the name and address of the Lender has been given by registered or certified mail to the Lessor prior to the date of any such default.

If the Lessee shall fail to cure said default within the time and in the manner provided for in this lease, then the Lender shall have an additional period of time equal to the time originally given to the Lessee to cure said default, and the Lessor will not act upon said default until the time of the Lender to cure said default has elapsed and the Lender has not cured said default. In the event of a default by the Lessee in any of the terms, covenants, provisions or conditions of this lease, or in the payment to the the Lender of any installment of principal or interest or in the performance of any other obligation of the Lessee to the Lender, the Lessor after written notice thereof from the Lender will exercise the right of termination of this lease granted to the Lessor pursuant to Paragraph 31 hereof (Right to Terminate Lease on Lessee's Defaults) and if the Lessee shall fail to vacate the apartment, will institute summary dispossess proceedings against the Lessee and take all steps and do all acts thereafter required in order to obtain possession of the apartment, all at the expense of the Lender, provided, however, that the Lender shall meanwhile pay all maintenance charges and other charges becoming due hereunder until this lease and the membership certificate or the shares allocated to the apartment are acquired for personal occupancy.

If Lessor shall fail to exercise its right to terminate and/or to commence summary proceedings or to take all steps or do all acts required to be done pursuant hereto, then and in that event, Lessor shall execute and deliver to the Lender a power of attorney coupled with an interest to act in the name of the Lessor in any of the ways provided for herein at the Lender's sole expense, and if the Lessor shall fail to execute and deliver such power of attorney within five days after demand, such power of attorney may be executed by the Lender on behalf of any, as the agent for the Lessor. The Lessee agrees that until any such loan is repaid to the Lender in full with interest, the Lessee shall not have any right to cancel this lease as provided in Paragraph 35 hereof and the Lessor agrees that until it receives written notice from the Lender that the entire amount of the loan with interest has been paid in full or discharged, the Lessor will not accept any surrender of this lease by the Lessee under Paragraph 35 hereof.

If this lease is terminated at the Lender's request by reason of a default by the Lessee in any of the terms, convenants, provisions, or in the payment to the Lender of any installment of principal or interest or in the performance of any other obligation of the Lessee to the Lender, the Lender may sell and assign the membership certificate or shares of the Lessor allocated to that apartment and this lease, or sublet the apartment, for the account of the Lender to a reputable person subject to approval of Lessor, which shall not be unreasonably withheld and subject to the requirements of Paragraph 46 of this lease and to the restrictions contained in the Corporation's

2

Certificate of Incorporation. If written notice of any such loan has been given to the Lessor by the Lender as aforesaid, the Lender may assign all its rights thereto and the shares or membership certificates of Lessor allocated to the apartment and this lease by giving written notice to the Lessor by certified or registered mail setting forth the name and address of the assignee, and such assignee and any subsequent assignee or assignees shall thereupon have all the rights of the Lender under this Paragraph 17.(b).

**Repairs by the Lessee**

18.(a)   The Lessee shall take possession of the apartment and its appurtenances and fixtures in its "as is" condition and state of repair as of the commencement of the term hereof. The Lessee shall be solely responsible for the painting and decorating required for his or her apartment, including the interior of window frames, sashes and sills, and shall be solely responsible the maintenance and repair of the interior of the apartment (including interior walls, floors and ceilings, but excluding windows, window panes, window frames, sashes, sills, entrance and terrace doors, frames and saddles) and shall be solely responsible for the maintenance, repair and replacement of plumbing, gas and heating fixtures and equipment and such refrigerators, dishwashers, removable and through-the-wall air conditioners, washing machines, ranges and other appliances that may be in the apartment. Plumbing, gas and heating fixtures as used herein shall include exposed gas, steam and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached and any special pipes or equipment which the Lessee may install within the wall or ceiling, or under the floor, but shall not include gas, steam, water or other pipes or conduits within the walls, ceilings or floors, or air conditioning, or heating equipment which is part of the standard building equipment. The Lessee shall be solely responsible for the maintenance, repair and replacement of all lighting and electrical fixtures, appliances, and equipment, and all meters, fuse boxes or circuit breakers and electrical wiring and conduits from the junction box at the riser into and through the Lessee's apartment.

**Odors and Noises**

(b)   The Lessee shall not permit any odors, which may constitute a health violation, to escape into the building. The Lessee shall not permit or allow any unreasonable noises or anything which will interfere with the rights of other Lessees or unreasonably annoy them or obstruct the public halls or stairways.

**Equipment and Appliances**

(c)   If, in the Lessor's sole judgment, any of the Lessee's equipment or appliances shall result in damage to the building or diminution or interruption of service to other portions of the building, or overloading of, or damage to, facilities maintained by the Lessor for the supplying of water, gas, electricity or air conditioning to the building, the Lessee shall promptly, on notice from the Lessor, remedy the condition and, pending such remedy, shall cease using any appliance or equipment which may be creating the objectionable condition.

**Rules and
Regulations**

**Requirements
of Mortgage**

(d) The Lessee will comply with all the requirements of the Board of Fire Underwriters, insurance authorities and all governmental authorities and with all laws, ordinances, rules and regulations with respect to the occupancy or use of the apartment. If any mortgage affecting the land or the building shall contain any provisions pertaining to the right of the Lessee to make changes or alterations in the apartment, or to remove any of the fixtures, appliances, equipment or installations, the Lessee herein shall comply with the requirements of such mortgage or mortgages relating thereto. Upon the Lessee's written request, Lessor will furnish Lessee with copies of applicable provisions of each and every such mortgage.

**Lessor's Right
to Remedy
Lessee's Defaults**

19.  The Lessor shall notify the Lessee to make repairs to any part of the apartment, its fixtures or equipment as set forth in 18.(a) or to remedy a condition as set forth in 18.(b), (c) or (d) only if the failure to repair or remedy a condition causes, or may cause, damage to the apartments of other Lessees, the public areas, or structural damage to the building, or impairs or may impair the Lessor's ability to provide essential services.

If the Lessee shall fail for 30 days after notice to make repairs to any part of the apartment, its fixtures or equipment as herein required, or shall fail to remedy a condition which has become objectionable to the Lessor for reasons herein stated, or if the Lessee or any person dwelling in the apartment shall request the Lessor, its agents or servants to perform any act not hereby required to be performed by the Lessor, the Lessor may make such repairs, or arrange for others to do the same, or remove such objectionable condition or equipment, or perform such act, without liability on the Lessor; provided that, if the condition requires prompt action, notice of less than 30 days may, or, in case of emergency, no notice need, be given. In all such cases, the Lessor, its agents, servants and contractors shall, as between the Lessor and Lessee, be conclusively deemed to be acting as agents of the Lessee and all contracts therefor made by the Lessor shall be so construed whether or not made in the name of the Lessee. If Lessee shall fail to perform or comply with any of the other covenants or provisions of this lease within the time required by a notice from Lessor (not less than 5 days), then Lessor may, but shall not be obligated to, comply therewith, and for such purposes may enter the apartment of Lessee. The Lessor shall be entitled to recover from the Lessee all expenses incurred or for which it has contracted hereunder, such expenses to be payable by the Lessee on demand as additional rent.

**Increase in
Rate of Fire
Insurance**

20.  The Lessee shall not permit or suffer anything to be done or kept in the apartment which will increase the rate of fire insurance on the building or the contents thereof. If, by reason of the occupancy or use of the apartment by the Lessee, the rate of fire insurance on the building or an apartment or the contents of either shall be increased, the Lessee shall (if such occupancy or use continues for more than 30 days after written notice from Lessor specifying the objectionable occupancy or use) become liable for the additional insurance premiums incurred by Lessor or any lessee or lessees of apartments in the building on all policies so affected, and the Lessor

84

shall have the right to collect the same for its benefit or the benefit of any such lessees as additional rent for the apartment due on the first day of the calendar month following written demand therefor by the Lessor.

**Alterations**

21.(a)  The Lessee shall not, without first obtaining the written consent of the Lessor, which consent shall not be unreasonably withheld, make in the apartment or building, or on any roof, penthouse, terrace or balcony appurtenant thereto, any alteration, enclosure or addition or any alteration of or addition to the water, gas or steam risers or pipes, heating or air conditioning system or units, electrical conduits, wiring or outlets, plumbing fixtures, intercommunication or alarm system, or any other installation or facility in the apartment or building. The performance by Lessee of any work in the apartment shall be in accordance with any applicable rules and regulations of the Lessor and governmental agencies having jurisdiction thereof. The Lessee shall not, in any case, install any appliances which will overload the existing wires or equipment in the building.

**Removal
of Fixtures**

(b)  Without Lessor's written consent, the Lessee shall not remove any fixtures, appliances, additions or improvements from the apartment except as hereinafter provided. If the Lessee, or a prior lessee, shall have heretofore placed, or the Lessee shall hereafter place in the apartment, at the Lessee's own expense, any additions, improvements, appliances or fixtures, including but not limited to fireplace mantels, lighting fixtures, refrigerators, air conditioners, dishwashers, washing machines, ranges, woodwork, wall paneling, ceilings, special doors or decorations, special cabinet work, special stair railings or other built-in ornamental items, which can be removed without structural alterations or permanent damage to the apartment, then title thereto shall remain in the Lessee and the Lessee shall have the right, prior to the termination of his lease, to remove the same at the Lessee's own expense, provided: (i) that the Lessee at the time of such removal shall not be in default in the payment of rent or in the performance or observance of any other covenants or conditions of this lease; and (ii) that the Lessee shall at the Lessee's own expense, prior to the termination of this lease, repair all damage to the apartment which shall have been caused by either the installation or removal of any such additions, improvements, appliances or fixtures; (iii) that if the Lessee shall have removed from the apartment any articles or materials owned by the Lessor or its predecessor in title, or any fixtures or equipment necessary for the use of the apartment, the Lessee shall either restore such articles and materials and fixtures and equipment and repair any damage resulting from their removal and restoration, or replace them with others of a kind and quality customary in comparable buildings and satisfactory to the Lessor; and (iv) that if any mortgagee acquired a lien on any such property prior to the execution of this lease, Lessor shall first procure from such mortgagee its written consent to such removal.

**Surrender
on Expiration
of Term**

(c)  On the expiration or termination of this lease, the Lessee shall surrender to the Lessor possession of the apartment with all additions, improvements, appliances and fixtures then included therein, except as hereinabove provided. Any additions, improvements, fixtures

85

or appliances not removed by the Lessee on or before such expiration or termination of this lease shall, at the option of the Lessor, be deemed abandoned and shall become the property of the Lessor and may be disposed of by the Lessor without liability or accountability to the Lessee.

**Lease Subordinate to Mortgages**

22.    This lease is and shall be subject and subordinate to all present and future leases, and to any mortgages now or hereafter that are liens upon such leases or on the land and building or buildings, and to any and all extensions, modifications, consolidations, renewals and replacements thereof. This clause shall be self-operative and no further instrument of subordination shall be required by any such mortgagee or lessee. In confirmation of such subordination the Lessee shall at any time, and from time to time, on demand, execute any instruments that may be required by any mortgagee, or by the Lessor, for the purpose of more formally subjecting this lease to the lien of any such mortgage or mortgages, and the duly elected officers, for the time being, of the Lessor are and each of them is hereby irrevocably appointed the attorney-in-fact and agent of the Lessee to execute the same upon such demand, and the Lessee hereby ratifies any such instrument hereafter executed by virtue of the power of attorney hereby given.

**Mechanic's Lien**

23.    In case a notice of mechanic's lien against the building shall be filed purporting to be for labor or material furnished or delivered at the building or the apartment to or for the Lessee, or anyone claiming under the Lessee, the Lessee shall forthwith cause such lien to be discharged by payment, bonding or otherwise; and if the Lessee shall fail to do so within ten days after notice from the Lessor, then the Lessor may cause such lien to be discharged by payment, bonding or otherwise, without investigation as to the validity thereof or of any offsets or defenses thereto, and shall have the right to collect, as additional rent, all amounts so paid and all costs and expenses paid or incurred in connection therewith, including reasonable attorneys' fees and disbursements, together with interest thereon from the time or times of payment.

**Cooperation**

24.    The Lessee shall always in good faith endeavor to observe and promote the cooperative purposes for the accomplishment of which the Lessor is incorporated.

**Right of Entry**

25.    The Lessor and its agents and their authorized workmen shall be permitted to visit, examine, or enter the apartment and any storage space assigned to Lessee at any reasonable hour of the day upon notice, or at any time and without notice in case of emergency, to make or facilitate repairs in any part of the building or to cure

14

any default by the Lessee and to remove such portions of the walls, floors and ceilings of the apartment and storage space as may be required for any such purpose, but the Lessor shall thereafter restore the apartment and storage space to its proper and usual condition at Lessor's expense if such repairs are the obligation of Lessor, or at Lessee's expense if such repairs are the obligation of Lessee, are caused by the act or omission of the Lessee or any of the Lessee's family, guests, roommate, or agents, employees or subtenents.

**Key**

In order that the Lessor shall at all times have access to the apartment or storage rooms for the purposes provided for in this lease, the Lessee shall provide the lessor with a key to each lock providing access to the apartment or the storage rooms, and if any lock shall be altered or new lock installed, the Lessee shall provide the Lessor with a key thereto immediately upon installation. If the Lessee shall not be personally present to open and permit an entry at any time when an entry therein shall be necessary or permissible hereunder and shall not have furnished a key to Lessor, the Lessor or the Lessor's agents (but, except in an emergency. only when specifically authorized by an officer of the Lessor) may forcibly enter the apartment or storage space without liability for damages by reason thereof (if during such entry the lessor shall accord reasonable care to the Lessee's property), and without in any manner affecting the obligations and covenants of this lease. The right and authority hereby reserved do not impose, nor does the Lessor assume by reason thereof, any responsibility or liability for the care or supervision of the apartment, or any of the pipes, fixtures, appliances or appurtenances therein contained, except as herein specifically provided.

**Waivers**

26. The failure of the Lessor to insist, in any one or more instances, upon a strict performance of any of the provisions of this lease, or to exercise any right or option herein contained. or to serve any notice, or to institute any action or proceeding, shall not be construed as a waiver, or a relinquishment for the future, of any such provisions, options or rights, but such provision, option or right shall continue and remain in full force and effect. The receipt by the Lessor of rent, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach, and no waiver by the Lessor of any provision hereof shall be deemed to have been made unless in a writing expressly approved by the Directors.

**Notices**

27. Any notice by or demand from either party to the other shall be duly given only if in writing and either personally served or sent by registered or certified mail, return receipt requested; if by the Lessee, addressed to the Lessor at the building with a copy sent by regular mail to the Lessor's Managing Agent; if to the Lessee, addressed to the building. Either party may by notice served in accordance herewith designate a different address for service of such notice or demand. Notices or demands shall be deemed given on the date when mailed.

**Reimbursement of Lessor's Expenses**

28. If the Lessee shall at any time be in default hereunder and the Lessor shall incur any expense (whether paid or not) in performing acts which the Lessee is required to perform, or in instituting any action or proceeding based on such default, or defending, or asserting a counterclaim in, any action or proceeding brought

by the Lessee, the expense thereof to the Lessor, including reasonable attorneys' fees and disbursements, shall be paid by the Lessee to the Lessor, on demand, as additional rent.

**Lessor's Immunities**

29(a)   The Lessor shall not be liable, except by reason of Lessor's negligence, for any failure or insufficiency of heat, water supply, electric current, gas, telephone or elevator service or other service to be supplied by the Lessor hereunder, or for interference with light, air, view or other interests of the Lessee.

Unless due to the Lessor's negligence, no abatement of rent or other compensation or claim of eviction shall be made or allowed if accidents, alterations, repairs or strikes, difficulty or delay in securing supplies or labor, or other cause beyond Lessor's control causes (i) the making or failure to make or delay in making any repairs, alterations or decorations to the building, or any fixtures or appurtenances therein, or (ii) the taking of space to comply with any law, ordinance or governmental regulation, or (iii) the interrupting or curtailing of any service agreed to be furnished by the Lessor.

**Storage Space and Laundry**

(b)   If the Lessor shall furnish to the Lessee any storage bins or space, the use of a laundry, or any facility outside the apartment, including but not limited to a television antenna, the same shall be deemed to have been furnished gratuitously by the Lessor under a revocable license.   The Lessee shall not use such storage space for the storage of valuable or perishable property and any such storage space assigned to Lessee shall be kept by Lessee clean and free of combustibles.   If washing machines or other equipment are made available to the Lessee, the Lessee shall use the same on the understanding that such machines or equipment may or may not be in good order and repair and that the Lessor is not responsible for such equipment, nor for any damage caused to the property of the Lessee resulting from the Lessee's use thereof, and that any use that Lessee may make of such equipment shall be at his own cost, risk and expense.

**Automobiles and Other Property**

(c)   The Lessor shall not be responsible for any damage to any automobile or other vehicle left in the care of any employee of the Lessor by the Lessee, and the Lessee hereby agrees to hold the Lessor harmless from any liability arising from any injury to person or property caused by or with such automobile or other vehicle while in the care of such employee. The Lessor shall not be responsible for any property left with or entrusted to any employee of the Lessor, or for the loss of or damage to any property within or without the apartment by theft or otherwise.

**Window Cleaning**

30.   The Lessee will not require, permit, or allow the cleaning of any window in the premises from the outside (within the meaning of Section 202 of the New York Labor Law) unless the equipment and safety devices required by law, ordinance, rules and regulations, including, without limitation, Section 202 of the New York Labor Law, are provided and used, and unless the industrial code of the State of New York is fully complied with; and the Lessee hereby

agrees to indemnify the Lessor and its employees, other lessees, and the managing agent, for all losses, damages or fines suffered by them as a result of the Lessee's requiring, permitting, or allowing any window in the premises to be cleaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and rules.

**Termination of Lessee by Lessor**

31.   If upon, or at any time after, the happening of any of the events mentioned in subdivisons (a) to (i) of this Paragraph 31, the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a date at least five days thereafter, the term of this lease shall expire on the date so fixed in such notice as fully and completely as if it were the date herein definitely fixed for the expiration of the term, and all right, title and interest of the Lessee hereunder shall thereupon wholly cease and expire, and the Lessee shall thereupon quit and surrender the apartment to the Lessor, it being the intention of the parties hereto to create hereby a conditional limitation, and thereupon the Lessor shall have the right to re-enter the apartment and to remove all persons and personal property therefrom, either by summary dispossess proceedings, or by any suitable action or proceeding at law or in equity, or otherwise, and to repossess the apartment in its former estate as if this lease had not been made, and no liability whatsoever shall attach to the Lessor by reason of the exercise of the right of re-entry, re-possession and removal herein granted and reserved:

**Lessee Ceasing to Hold Accompanying Membership Certificates or Shares**

(a)   If the Lessee shall cease to be the holder of the membership certificate or the shares to which this lease is appurtenant, or if this lease shall pass or be assigned to anyone who is not then the holder of the membership certificate or shares;

**Lessee Becoming a Bankrupt**

(b)   If at any time during the term of this lease, (i)  the then holder hereof shall be adjudicated a bankrupt under the laws of the United States; or (ii) a receiver of all the property of such holder or of this lease shall be appointed under any provision of the laws of the State of New York, or under any statute of the United States, or any statute of any state of the United States and the order appointing such receiver shall not be vacated within thirty days; or (iii) such holder shall make a general assignment for the benefit of creditors; or (iv) the membership certificate or the shares of such holder to which this lease is appurtenant shall be duly levied upon under the process of any court whatever unless such levy shall be discharged within thirty days; or (v) this lease or the membership certificate or any of the shares to which it is appurtenant shall pass by operation of law or otherwise to anyone other than the Lessee herein named or a person to whom such Lessee has assigned this lease in the manner herein permitted, but this subsection (v) shall not be applicable if this lease shall devolve upon the executors or administrators of the Lessee and provided that within sixty (60) days (which period may be extended by the Directors) after the death said lease and membership certificate or shares shall have been transferred to any assignee in accordance with Paragraph 16 hereof;

Assignment,
Subletting
or
Unauthorized
Occupancy

(c) If there be an assignment of this lease, or any subletting hereunder, without full compliance with the requirements of Paragraph 15 or 16 or 38 hereof; or if any person not authorized by Paragraph 14 shall be permitted to use or occupy the apartment, and the Lessee shall fail to cause such unauthorized person to vacate the apartment within thirty days after written notice from the Lessor;

Default
in Rent

(d) If the Lessee be in default for a period of one month in the payment of any rent or additional rent or of any installment thereof and shall fail to cure such default within ten days after written notice from the Lessor;

Default
in Other
Covenants

(e) If the Lessee shall be in default in the performance of any covenant or provision hereof, other than the covenant to pay rent, and such default shall continue for thirty days after written notice from the Lessor;

Lessee's
Objectionable
Conduct

(f) If at any time the Lessor shall determine, upon the affirmative vote of two-thirds of its then Board of Directors, at a meeting duly called for that purpose, that because of objectionable conduct on the part of the Lessee, or of a person dwelling or visiting in the apartment, the tenancy of the Lessee is undesirable, if repeated after written notice from the Lessor;

Termination
of All
Proprietary
Leases

(g) If at any time the Lessor shall determine, upon the affirmative vote of two-thirds of its then Board of Directors at a meeting of such directors duly called for that purpose, and the affirmative vote of at least 75% of the members or shareholders at a members' or shareholders' meeting duly called for that purpose, to terminate all proprietary leases;

Destruction
of Building

(h) If the building shall be destroyed or damaged and the members or shareholders shall decide to not repair or rebuild as provided in Paragraph 4;

Condemnation

(i) If at any time the building or a substantial portion thereof shall be taken by condemnation proceedings.

Lessor's Rights
After Lessee's
Default

32.(a) In the event the Lessor resumes possession of the apartment, either by summary proceedings, action of ejectment or otherwise, because of default by the Lessee in the payment of any rent or additional rent due hereunder, or on the expiration of the term pursuant to a notice given as provided in Paragraph 31 hereof upon the happening of any event specified in subsections (a) to (f) inclusive of Paragraph 31, Lessee shall continue to remain liable for payment of a sum equal to the rent which would have become due hereunder and shall pay the same in installments at the time such rent would be due hereunder. No suit brought to recover any installment of such rent or additional rent shall prejudice the right of the Lessor to recover any subsequent installment. After resuming possession, the Lessor may, at its option, from time to time (i) relet the apartment for its own account, or (ii) relet the apartment as the agent of the Lessee, in the name of the Lessee or in its own name, for a term